[No. S014212. Feb. 27, 1992.]

VINCENT A. GANTT, Plaintiff and Respondent, v.
SENTRY INSURANCE et al., Defendants and Appellants.

1084

## COUNSEL

Hanson, Bridgett, Marcus, Vlahos & Rudy, Douglas H. Barton and Bonnie Kathleen Gibson for Defendants and Appellants.

Proskauer, Rose, Goetz & Mendelsohn, Steven G. Drapkin, Philip L. Ross, O'Melveny & Myers, Stephen P. Pepe and Craig A. Horowitz as Amici Curiae on behalf of Defendants and Appellants.

Matheny, Poidmore & Sears, Anthony J. Poidmore and Michael A. Bishop for Plaintiff and Respondent.

Joseph Posner as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—We granted review in this case to consider whether an employee who was terminated in retaliation for supporting a coworker's claim of sexual harassment may state a cause of action for tortious discharge against public policy and, if so, whether the exclusive remedy provisions of the Workers' Compensation Act bar the action. We hold that the claim is actionable under *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*), and is not pre-empted by the workers' compensation law.

## I. PROCEDURAL BACKGROUND

Defendants, Sentry Insurance (Sentry), Frank Singer (Singer) and Caroline Fribance (Fribance) appealed from a judgment entered on a jury verdict of $1.34 million in favor of plaintiff, Vincent A. Gantt (hereafter plaintiff or Gantt) in his action for tortious discharge in violation of the covenant of good faith and fair dealing and in contravention of public policy (*Tameny, supra,* 27 Cal.3d 167), defamation, and intentional infliction of emotional distress.

The Court of Appeal reversed the judgment as to the individual defendants but affirmed in all other respects. As to the *Tameny* cause of action, the Court of Appeal noted that the allegation was predicated upon two distinct theories: the first, that plaintiff was constructively discharged in retaliation for supporting a coworker's claim of sexual harassment; and second, that Sentry attempted to induce plaintiff to give false information or to withhold information from the public agency investigating the sexual harassment charges. Although the Court of Appeal concluded that Gantt's first theory of recovery was preempted by the California Fair Employment and Housing Act (FEHA), it held that the FEHA did not preempt a *Tameny* claim premised on the second theory; that substantial evidence supported the jury's special verdict; and that the action was not barred by the exclusive remedy provisions of the Workers' Compensation Act.[1]

Sentry petitioned this court for review, asserting that neither the facts nor the law supported a *Tameny* claim premised on plaintiff's second theory, and that the action was barred in any event by the workers' compensation law. After granting review, we requested additional briefing on the question whether a *Tameny* claim must be grounded in a violation of statute or constitutional provision.[2]

For the reasons set forth below, we conclude that a termination in retaliation for testifying truthfully concerning a coworker's sexual harassment

---

[1] With respect to Gantt's other causes of action, the Court of Appeal held that the tort claim for breach of the covenant of good faith and fair dealing was invalid under this court's decisions in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] and *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059]; that the intentional infliction of emotional distress claim was barred by the exclusive remedy provisions of the workers' compensation law as construed by this court in *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743]; and that the defamation action was precluded because of the privileged nature of the statements at issue. Because plaintiff sought recovery against the individual defendants (Singer and Fribance) solely on the grounds of defamation and intentional infliction of emotional distress, the Court of Appeal reversed the judgment as to them. Gantt did not seek review of these portions of the Court of Appeal's decision.

[2] We also requested additional briefing on the question whether, in light of our intervening decision in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373], the Court of

claim in the context of an administrative investigation is actionable under *Tameny, supra,* 27 Cal.3d 167. We further conclude that neither the FEHA nor the Workers' Compensation Act preempts the claim. Accordingly, we shall affirm the decision of the Court of Appeal.

## II. FACTS

Viewing the record most strongly in favor of the judgment, as we must (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 938 [160 Cal.Rptr. 141, 603 P.2d 58]), the following pertinent chronology of facts appears: In September 1979, Sentry hired Gantt to serve as the sales manager of its Sacramento office. His mission was to develop the Sacramento sales force. How successfully he performed this task was the subject of conflicting evidence at trial. However, as explained below, the record amply supports the jury's specific finding that his demotion and constructive discharge were the product of his support for another employee's sexual harassment claim rather than the result of any legally valid business reason.

The specific circumstances which led to Gantt's estrangement from Sentry centered on Joyce Bruno, who was hired in January 1980 to be the liaison between trade associations and Sentry's Sacramento and Walnut Creek offices. In that capacity, Ms. Bruno reported to both Gantt and Gary Desser, the manager of the Walnut Creek office, as well as Brian Cullen, a technical supervisor at regional headquarters in Scottsdale, Arizona.

Shortly after she was hired, Ms. Bruno experienced sexual harassment at the hands of Desser. As the harassment continued, she complained to Gantt. He recommended she report it to Cullen in Scottsdale. Ultimately, Gantt himself contacted both Bonnie Caroline, who was responsible for receiving complaints of sexual discrimination, and Dave Berg, his immediate supervisor, about the problem. Despite these reports, the harassment continued. Accordingly, Gantt took it upon himself to speak a second time with both Berg and Ms. Caroline. Finally, in early 1981, Desser was demoted from sales manager to sales representative and replaced by Robert Warren. In March, Ms. Bruno was transferred to a sales representative position. A month later, however, she was fired.

Gantt stated that he was present at the April meeting in which Berg directed Warren to fire Bruno and ridiculed Gantt for supporting her. The following month, Berg himself resigned from Sentry following an investigation into claims that he had engaged in sexual harassment. Berg's replacement, Frank Singer, assumed the title "Director of Sales" and recruited John

Appeal erred in holding plaintiff's first *Tameny* theory to have been preempted by the FEHA. Because we uphold plaintiff's *Tameny* claim under the second theory advanced at trial, we need not address this aspect of the decision of the Court of Appeal.

Tailby to assume Berg's old position supervising the various sales offices. According to one witness, Tailby said Singer told him that getting rid of Gantt was to be one of his first tasks. Tailby resisted, however, and in 1981 Gantt was ranked among Sentry's top district managers in premium growth.

Bruno, meanwhile, filed a complaint with the Department of Fair Employment and Housing (DFEH). She alleged harassment by Desser and failure by Sentry's higher management to act on her complaints. Caroline Fribance, Sentry's house counsel in charge of labor-related matters, undertook to investigate the matter. Gantt informed Fribance that he had reported Bruno's complaints to personnel in Scottsdale. However, Gantt gained the impression that he was being pressured by Fribance to retract his claim that he had informed Scottsdale of the complaints. Later, following the interview with Fribance, Tailby cautioned Gantt that Singer and others in the company did not care for Gantt. In a follow-up memorandum, Tailby cautioned Gantt that "it sometimes appears that you are involved in some kind of 'intrigue' and 'undercover' operation." In December 1982, Tailby rated Gantt's overall work performance for the year as "acceptable." Without directly informing Gantt, Singer changed the rating to "borderline acceptable/unacceptable."

Shortly thereafter, John Thompson, a DFEH investigator, contacted Fribance to arrange interviews with certain employees, including Gantt. Because of his growing unease about Fribance, Gantt arranged to meet secretly with Thompson before the scheduled interview. Gantt told him the facts of which he was aware, including his reporting of Bruno's complaints to Scottsdale, and Thompson assured him that he would be protected under the law from any retaliation for his statements. Thompson gained the impression that Gantt felt he was being pressured and was extremely fearful of retaliation because of his unfavorable testimony.

Gantt met with Fribance the day before his formal DFEH interview. She repeatedly reminded him that he was the only management employee supporting Ms. Bruno's claim that she had notified management about the harassment. Plaintiff felt that Fribance was unhappy with his testimony and that her unstated intent was to induce him to change his story. She also told him about another employee who had been found guilty of sexual harassment but retained by the company because he was a loyal employee. It was also during this meeting that Gantt discovered the change in his December 1982 evaluation. These events confirmed his fears that the company was pressuring him to withhold testimony or face retaliation.

The official DFEH interviews took place the next day. Fribance was present during Thompson's interview with Gantt. Following the interview,

Fribance asked Thompson why he was not investigating sexual harassment charges against Gantt; she indicated that Gantt had harassed Bruno and was trying to deflect attention from himself. Thompson was surprised by Fribance's statements since he had never experienced a company attorney suggesting that charges be brought against one of the company's own employees.[3]

Less than two months later, on March 3, 1983, Gantt attended an awards ceremony in Scottsdale to accept a life insurance sales award on behalf of his office. The following morning, Singer and Tailby informed him that he was being demoted to sales representative. Shortly thereafter, Gantt's new supervisor, Neil Whitman, warned him that he would be fired if he attempted to undermine Whitman's authority. Gantt was also informed that he would not be given a "book" of existing accounts to start his new job; according to Gantt, such a book was necessary to survive.

During the following month, Gantt was in the office only intermittently. He experienced a variety of illnesses and took vacation time and sick leave. In mid-April he was offered and accepted a position with another company. He left Sentry's payroll in early May. Two months later, he filed the instant lawsuit alleging that "as a result of the pressure applied by the defendants . . . he was forced to resign."

As noted earlier, the jury returned a special verdict in favor of Gantt, finding, inter alia, that Gantt had been constructively discharged; that Sentry lacked an "honest good faith belief the termination was warranted for legally valid business reasons"; that Gantt was discharged "in retaliation for his refusal to testify untruthfully or to withhold testimony"; that Gantt was further discharged in retaliation for his "actions or statements with respect to Joyce Bruno's sexual harassment allegations"; and that in committing these acts Sentry acted with malice, oppression or fraud.

### III. Discussion

#### A. *Sources of the Public Policy Exception*

This court first recognized a public policy exception to the at-will employment doctrine in *Tameny, supra,* 27 Cal.3d 167, and has since reaffirmed its commitment to that principle on several occasions (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 665-671; *Shoemaker* v. *Myers* (1990) 52 Cal.3d

---

[3]Although Fribance disputed Thompson's characterization of her statements, the jury specifically found that Fribance told Thompson that Gantt had sexually harassed Ms. Bruno; that the statement was false; and that Fribance had acted with malice, oppression or fraud.

1, 23 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720]), and most recently in *Rojo* v. *Kliger, supra,* 52 Cal.3d 65, 88-89. Indeed, following the seminal California decision in *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25], the antecedent to our holding in *Tameny,* the vast majority of states have recognized that an at-will employee possesses a tort action when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn. (See *Cloutier* v. *Great Atlantic & Pac. Tea Co.* (1981) 121 N.H. 915 [436 A.2d 1140, 1144]; *Coman* v. *Thomas Mfg. Co., Inc.* (1989) 325 N.C. 172 [381 S.E.2d 445, 447]; *Cummins* v. *EG & G Sealol, Inc.* (D.R.I. 1988) 690 F.Supp. 134, 137; *Phipps* v. *Clark Oil & Refining Corp.* (Minn.Ct.App. 1986) 396 N.W.2d 588, 591, and the cases cited therein.)

Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy. In *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, we endeavored to provide some guidelines by noting that the policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; in addition, the policy must be "fundamental," "substantial" and "well established" at the time of the discharge. (*Id.* at pp. 669-670.)

We declined in *Foley* to determine whether the violation of a statute or constitutional provision is invariably a prerequisite to the conclusion that a discharge violates public policy. A review of the pertinent case law in California and elsewhere, however, reveals that few courts have recognized a public policy claim absent a statute or constitutional provision evidencing the policy in question. Indeed, as courts and commentators alike have noted, the cases in which violations of public policy are found generally fall into four categories: (1) refusing to violate a statute (see, e.g., *Tameny, supra,* 27 Cal.3d 167 [employee discharged for refusing to participate in illegal price-fixing scheme]; *Petermann* v. *International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184 [employee terminated for refusing to perjure himself before state legislative committee]); (2) performing a statutory obligation (see, e.g., *Nees* v. *Hocks* (1975) 272 Ore. 210 [536 P.2d 512] [performing jury duty]);[4] (3) exercising a statutory right or privilege (*Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168 [79 Cal.Rptr. 543]

---

[4]Although the court in *Mallard* v. *Boring* (1960) 182 Cal.App.2d 390 [6 Cal.Rptr. 171] rejected a public policy claim premised on a retaliatory discharge for engaging in jury service,

[engaging in union activities]); and (4) reporting an alleged violation of a statute of public importance (*Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015]; see generally Note, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception* (1983) 96 Harv. L.Rev. 1931, 1936-1937; Rust et al., *Employee Termination At Will: A Principled Approach* (1982) 28 Vill. L.Rev. 1, 26-27.)

To be sure, those courts which have addressed the issue appear to be divided over the question whether nonlegislative sources may ever provide the basis of a public policy claim. *Pierce* v. *Ortho Pharmaceutical Corp.* (1980) 84 N.J. 58 [417 A.2d 505, 12 A.L.R.4th 520] is the leading case for a broad interpretation. As the New Jersey Supreme Court explained: "The sources of public policy [which may limit the employer's right of discharge] include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." (*Id.* at p. 512.) Several other states have adopted similarly broad views of the public policy exception. (See *Parnar* v. *Americana Hotels, Inc.* (1982) 65 Hawaii 370 [652 P.2d 625, 631] ["In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy."]; *Palmateer* v. *International Harvester Co.* (1981) 85 Ill.2d 124 [52 Ill. Dec. 13, 421 N.E.2d 876, 878] ["In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions."]; *Boyle* v. *Vista Eyewear, Inc.* (Mo.Ct.App. 1985) 700 S.W.2d 859, 871 [" 'Public policy' is that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good . . . . It finds its sources in the state constitution, . . . in the letter and purpose of a constitutional, statutory or regulatory provision or scheme, . . . in the judicial decisions of the state and national courts, . . . in 'the constant practice of the government officials,' . . . and, in certain instances, in professional codes of ethics."]; *Phipps* v. *Clark Oil & Refining Corp., supra*, 396 N.W.2d 588, 593 ["A public policy exception can be reasonably defined by reference to clear mandates of legislative or judicially recognized public policy."]; *Cloutier* v. *Great Atlantic & Pac. Tea Co., supra*, 436 A.2d 1140, 1144 ["Public policy

the court inexplicably failed to consider the clear statutory and constitutional bases for such a claim. (See *Nees* v. *Hocks, supra*, 536 P.2d 512, 516; *Reuther* v. *Fowler & Williams, Inc.* (1978) 255 Pa.Super. 28 [386 A.2d 119, 120-121].) Moreover, the Legislature has since enacted specific legislation which makes it unlawful to terminate or otherwise discriminate against an employee for jury service. (Lab. Code, § 230.)

exceptions giving rise to wrongful discharge actions may also be based on non-statutory policies."]; *Wagenseller* v. *Scottsdale Memorial Hospital* (1985) 147 Ariz. 370 [710 P.2d 1025, 1034] ["reliance on prior judicial decisions, as part of the body of applicable common law, is appropriate . . ."]; *Yetter* v. *Ward Trucking Corp.* (1991) 401 Pa.Super. 467 [585 A.2d 1022, 1027] ["appellant has failed to point to any statutorily or judicially recognized public policy which was violated by appellee in terminating appellant"]; *Payne* v. *Rozendaal* (1986) 147 Vt. 488 [520 A.2d 586, 589] ["we necessarily reject . . . the holdings of some courts that the public policy exception to at will employment contracts must be legislatively defined."]; accord, *Burk* v. *K-Mart Corp.* (Okla. 1989) 770 P.2d 24, 28; *Thompson* v. *St. Regis Paper Co.* (1984) 102 Wn.2d 219 [685 P.2d 1081, 1089]; *Moore* v. *A.H. Riise Gift Shops* (D.V.I. 1987) 659 F.Supp. 1417, 1423.)

Other courts have applied a stricter definition to public policy claims. The leading case is *Brockmeyer* v. *Dun & Bradstreet* (1983) 113 Wis.2d 561 [335 N.W.2d 834]. There, the Wisconsin Supreme Court, while recognizing a public policy exception to the employment at-will doctrine, nevertheless limited plaintiffs to contract damages and confined such claims to statutory or constitutional violations. "Given the vagueness of the concept of public policy," the court explained, "it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision." (*Id.* at p. 840.) Voicing similar concerns, the Kentucky Supreme Court adopted the *Brockmeyer* definition in *Firestone Textile Co. Div.* v. *Meadows* (Ky. 1983) 666 S.W.2d 730: "Employers as a group have a legitimate interest to protect by having the cause of action for wrongful discharge clearly defined and suitably controlled. . . . [¶] When a discharged employee seeks to establish a cause of action for wrongful discharge, it is a question of law for the court to decide whether the reason for discharge is unlawful because of a constitutionally protected right or a right implicit in a statute." (*Id.* at p. 733.) Other courts have adopted similarly restrictive views of the contours of the public policy exception. (See *Sabine Pilot Service, Inc.* v. *Hauck* (Tex. 1985) 687 S.W.2d 733, 735; *Adams* v. *George W. Cochran & Co., Inc.* (D.C. 1991) 597 A.2d 28, 33-34; *Miller* v. *Fairfield Communities, Inc.* (1989) 299 S.C. 23 [382 S.E.2d 16, 19]; *Merck* v. *Advanced Drainage Systems, Inc.* (4th Cir. 1990) 921 F.2d 549, 554-555 [applying S.C. law].)[5]

Turning from other jurisdictions to California law, one finds the courts similarly divided. As we recently observed in *Foley* v. *Interactive Data*

---

[5]Although the decision of the Maryland Court of Appeals in *Adler* v. *American Standard Corp.* (1981) 291 Md. 31 [432 A.2d 464], has been cited for the narrow view of public policy (see *Merck* v. *Advanced Drainage Systems, Inc., supra,* 921 F.2d at pp. 554-555), in fact the

*Corp., supra,* 47 Cal.3d 654: "Several subsequent Court of Appeal cases have limited our holding [in *Tameny*] to policies derived from statute. (See *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 477 [199 Cal.Rptr. 613]; *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813, 819 [226 Cal.Rptr. 570]; *Tyco Industries, Inc.* v. *Superior Court* (1985) 164 Cal.App.3d 148, 159 [211 Cal.Rptr. 540].) . . . [¶] At least three other Court of Appeal decisions addressing the issue of where policy giving rise to an action may be found have concluded in dicta that public policy, as a basis for a wrongful discharge action, need not be policy rooted in a statute or constitutional provision. (See *Koehrer* v. *Superior Court* [(1986)] 181 Cal.App.3d 1155, 1165, 1167 [226 Cal.Rptr. 820]; *Garcia* v. *Rockwell Internat. Corp.* (1986) 187 Cal.App.3d 1556, 1561 [232 Cal.Rptr. 490]; *Dabbs* v. *Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437, 1443-1444 [234 Cal.Rptr. 129].)" (*Id.* at pp. 668-669; see also *Verduzco* v. *General Dynamics, Convair Div.* (S.D.Cal. 1990) 742 F.Supp. 559.)

Although we have not taken a position on this precise issue, it is true, as plaintiff notes, that this court has not previously confined itself to legislative enactments when determining the public policy of the state. We have, for example, long declined to enforce contracts inimical to law or the public interest (see *Kreamer* v. *Earl* (1891) 91 Cal. 112, 117 [27 P. 735]), and long ago declared racial discrimination to be contrary to public policy under the common law duty of innkeepers and common carriers to furnish accommodations to all persons. (*James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 740 [155 P.2d 329, 160 A.L.R. 900]; see *Safeway Stores* v. *Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574 [261 P.2d 721] ["In cases without number the state courts have declared contracts, transactions and activities of individuals, associations and corporations to be contrary to public policy where their legislative departments have not spoken on the subject."]; see also *Craemer* v. *Superior Court* (1968) 265 Cal.App.2d 216, 222 [71 Cal.Rptr. 193]; *Wagenseller* v. *Scottsdale Memorial Hosp., supra,* 710 P.2d at p. 1033.)[6]

The analogy to illegal contracts has particular force. For at root, the public policy exception rests on the recognition that in a civilized society the rights

---

Maryland high court merely cautioned that "recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch." (432 A.2d 472.) A subsequent Maryland Court of Special Appeals decision observed that *Adler* recognized as legitimate sources of public policy "legislative enactments, prior judicial decisions and administrative regulations. . . ." (*Townsend* v. *L.W.M. Management, Inc.* (1985) 64 Md.App. 55 [494 A.2d 239, 242].)

[6]As the Court of Appeal has stated: "It is primarily the prerogative of the legislature to declare what contracts and acts shall be unlawful; but courts, following the spirit and genius of the law, written and unwritten, of a state, may declare void as against public policy contracts which, though not in terms specifically forbidden by legislation, are clearly injurious to the interests of society." (*Maryland C. Co.* v. *Fidelity etc. Co.* (1925) 71 Cal.App. 492, 497 [236 P. 210]; see also *Kreamer* v. *Earl, supra,* 91 Cal. at p. 117 (internal quotation marks

of each person are necessarily limited by the rights of others and of the public at large; this is the delicate balance which holds such societies together. ■ Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy. Any other conclusion would sanction lawlessness, which courts by their very nature are bound to oppose. (See *Morrill v. Nightingale* (1892) 93 Cal. 452, 458 [28 P. 1068] [" 'Courts owe it to public justice and to their own integrity to refuse to become parties to contracts essentially violating morality or public policy by entertaining actions upon them.' "].) It is a very short and logical step, therefore, from declining to enforce contracts inimical to law or the public interest, to refusing to sanction terminations in contravention of fundamental public policy. Indeed, we expressly acknowledged the analogy in *Foley*, noting, in the context of our *Tameny* discussion: "A comparison of the manner in which contracts for illegal purposes are treated is useful." (47 Cal.3d at p. 667, fn. 7; see also *Phipps v. Clark Oil & Refining Corp., supra*, 396 N.W.2d at p. 593.)

Unfortunately, as we have also previously acknowledged, "[t]he term 'public policy' is inherently not subject to precise definition. . . . 'By "public policy" is intended that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. . . .' " (*Safeway Stores v. Retail Clerks etc. Assn., supra*, 41 Cal. 2d at p. 575.) It was this rather open-ended definition on which the court relied in *Petermann v. International Brotherhood of Teamsters, supra*, 174 Cal.App.2d 184, 188, the seminal decision articulating the public policy exception to the employment at-will doctrine.

Surveying the extensive and conflicting decisional law summarized above, several general observations are possible. First, notwithstanding the lively theoretical debate over the sources of public policy which may support a wrongful discharge claim, with few exceptions courts have, in practice, relied to some extent on statutory or constitutional expressions of public policy as a basis of the employee's claim. (See, e.g., *Dabbs v. Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437, 1443 [234 Cal.Rptr. 129] ["We disagree with the . . . suggestion that the Legislature is the only source of policy determinations . . . . However, . . . in this case there is statutory support for plaintiff's assertion her discharge violated a substantial public policy principle."]; see also *Wagenseller v. Scottsdale Memorial Hosp., supra*, 710 P.2d at pp. 1033-1035; *Palmateer v. International Harvester Co.,*

---

omitted) ["No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication."]; *Althschul v. Sayble* (1978) 83 Cal.App.3d 153, 162 [147 Cal.Rptr. 716].)

*supra*, 421 N.E.2d at pp. 878-880; *Boyle* v. *Vista Eyewear, Inc., supra*, 700 S.W.2d at pp. 871-872; *Cloutier* v. *Great Atlantic & Pac. Tea Co., supra*, 436 A.2d at pp. 1143-1145.)

Second, it is generally agreed that "public policy" as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." (*Hentzel* v. *Singer Co., supra*, 138 Cal.App.3d 290, 297.) Indeed, one of the most frequently cited decisions favoring a broad interpretation, *Parnar* v. *Americana Hotels, Inc., supra*, 652 P.2d 625, observed that courts "should proceed cautiously" if called upon to declare public policy absent some prior legislative expression on the subject. (*Id.* at p. 631; accord *Wagenseller* v. *Scottsdale Memorial Hosp., supra*, 710 P.2d at p. 1034; *Burk* v. *K-Mart Corp., supra*, 770 P.2d at pp. 28-29; *Townsend* v. *L.W.M. Management, Inc., supra*, 494 A.2d at p. 242.)

 These wise caveats against judicial policymaking are unnecessary if one recognizes that courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded.

B. *Application of the Public Policy Exception*

Here, we are *not* being asked to declare public policy. The issue as framed by the pleadings and the parties is whether there exists a clear constitutional or legislative declaration of fundamental public policy forbidding plaintiff's discharge under the facts and circumstances presented.

Initially, the parties dispute whether the discharge of an employee in retaliation for reporting a coworker's claim of sexual harassment to higher management may rise to the level of a *Tameny* violation. Sentry argues that such reporting inures only to the benefit of the employee in question rather than to the public at large, and questions the constitutional or statutory basis

of such a claim. Plaintiff responds that the same constitutional provision (Cal. Const., art. I, § 8) that prohibits sexual discrimination against employees and demands a workplace free from the pernicious influence of sexual harassment (see *Rojo* v. *Kliger, supra,* 52 Cal.3d at pp. 89-90) also protects the employee who courageously intervenes on behalf of a harassed colleague.

Although Sentry did not discriminate against Gantt on account of his sex within the meaning of the constitutional provision, there is nevertheless direct statutory support for the jury's express finding that Sentry violated a fundamental public policy when it constructively discharged plaintiff "in retaliation for his refusal to testify untruthfully or to withhold testimony" in the course of the DFEH investigation. Indeed, *Petermann* v. *International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184, "one of the seminal California decisions in this area" (*Tameny, supra,* 27 Cal.3d 167, 173), presented the parallel situation of an employee who was dismissed from his position because he had refused to follow his employer's instructions to testify falsely under oath before a legislative committee. Such conduct, the court concluded, could not be condoned as a matter of "public policy and sound morality." "It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee . . . on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. . . . The public policy of this state as reflected in the Penal Code sections referred to above [Pen. Code, §§ 118, 653f] would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury." (174 Cal.App.2d at pp. 188-189.)

We endorsed the principles of *Petermann* in *Tameny*, holding that an employee who alleged that he was discharged because he refused to participate in an illegal price fixing scheme may subject his employer "to liability for compensatory and punitive damages under normal tort principles." (27 Cal.3d 167, 169.) As we explained: "[A]n employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." (*Id.* at p. 178.)

The instant case fits squarely within the rubric of *Petermann* and *Tameny*. The FEHA specifically enjoins any obstruction of a DFEH investigation.

Government Code section 12975 provides: "Any person who shall willfully resist, prevent, impede or interfere with any member of the department or the commission or any of its agents or employees in the performance of duties pursuant to the provisions of this part relating to employment discrimination, . . . is guilty of a misdemeanor" punishable by fine or imprisonment. Nowhere in our society is the need greater than in protecting well motivated employees who come forward to testify truthfully in an administrative investigation of charges of discrimination based on sexual harassment. It is self-evident that few employees would cooperate with such investigations if the price were retaliatory discharge from employment.[7]

Thus, any attempt to induce or coerce an employee to lie to a DFEH investigator plainly contravenes the public policy of this state. Accordingly, we hold that plaintiff established a valid *Tameny* claim based on the theory of retaliation for refusal to withhold information or to provide false information to the DFEH.

### C. *The Workers' Compensation Act Does Not Preempt the Tameny Claim*

In *Shoemaker* v. *Myers, supra,* 52 Cal.3d 1, we held, inter alia, that "injuries arising from termination of employment ordinarily arise out of and in the course of the employment within the meaning of Labor Code section 3600 . . . ." (*Id.* at pp. 19-20.)[8] Relying on that basic premise, the employer in *Shoemaker* argued that the exclusive remedy provisions of the Workers'

---

[7] In a supplemental brief, Sentry argues that Government Code section 12975 was intended to apply only to "physical" interference with DFEH investigators. Nothing in the legislative history or application of the statute reflects such a narrow scope of operation. Webster defines "impede" as, inter alia, "to interfere with or get in the way of the progress of." (Webster's New Internat. Dict. (3d ed. 1961) p. 1132.) "Interfere" is defined, in part, as "to enter into or take a part in the concerns of others." (*Id.* at p. 1178.) Thus, by its plain terms, the statute is not confined to mere "physical" interference with DFEH investigators.

[8] Although *Shoemaker* held that "injuries resulting from the termination of employment may be included within the scope of workers' compensation" (52 Cal.3d at p. 18), we observed in a footnote that our holding was limited to the circumstances in which a substantial portion of the plaintiff's injuries occurred prior to termination. (*Id.* at p. 14, fn. 6.) Such a rule, we explained, "avoids the evidentiary nightmare that might result from application of the *Georgia-Pacific* [*Corp.* v. *Workers' Comp. Appeals Bd.* (1983) 144 Cal.App.3d 72 (192 Cal.Rptr. 643)] dictum requiring differentiating between injuries, especially psychological injuries, caused by conduct leading up to the termination and injuries caused by the termination itself. Accordingly, we hold that both the act of termination and the acts leading up to termination necessarily arise out of and occur during and in the course of the employment." (*Id.* at p. 20.) That was precisely the situation here. The evidence established that plaintiff's physical and psychological deterioration commenced during the employment, worsened with his demotion from management to sales, and became acute in the months leading up to his constructive discharge. Accordingly, as in *Shoemaker,* we need not decide whether workers' compensation applies where the injuries arise "only *after* the termination." (52 Cal. 3d at p. 14, fn. 6, original italics.)

Compensation Act preempted the plaintiff's wrongful discharge claim brought on a *Tameny* theory. Because it had not been considered by the Court of Appeal, however, we did not address the employer's argument or the plaintiff's response that his *Tameny* cause of action was not preempted "because such a termination . . . falls outside the compensation bargain." (*Id.* at p. 23.)

Sentry, together with amicus curiae Merchants & Manufacturers Association, once again ask this court to revoke or sharply restrict the tort remedy we so recently recognized in *Tameny, supra,* 27 Cal.3d 167, and reaffirmed in *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 1, 665-671, and *Rojo* v. *Kliger, supra,* 52 Cal.3d 65, 88-91. Like the employer in *Shoemaker,* the heart of their argument is that the Workers' Compensation Act provides the exclusive remedy for plaintiff's injuries.[9] As explained below, however, we decline the invitation to retreat from our long-held view that employees discharged in violation of fundamental public policy may bring an action against their employers sounding in tort.

The determination that *Tameny* claims are not preempted by the exclusive remedy provisions of the Workers' Compensation Act follows ineluctably from our unwavering commitment to the principle, stated most recently in *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, that the *Tameny* cause of action " 'reflects a duty imposed by law upon all employers in order to implement the fundamental public policies [of the state] . . . . As such, a wrongful discharge suit exhibits the classic elements of a tort cause of action.' " (*Id.* at p. 668, quoting *Tameny, supra,* 27 Cal.3d at p. 176.) Indeed, the same day that *Shoemaker* was filed, we reaffirmed our allegiance to this principle by holding, in *Rojo* v. *Kliger, supra,* 52 Cal.3d 65, that an employee terminated in retaliation for refusing an employer's sexual advances may state a wrongful termination cause of action in tort. (*Id.* at pp. 88-91.)

We recognize, of course, the force of the maxim that a case is not authority for a point that was not actually decided therein. (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].) However, this court does not engage in idle or capricious acts. We did not recognize the extraordinary claims of the employee terminated in violation of fundamental state policies, claims which entitle him or her to a wrongful discharge action in tort, only to withdraw that recognition a few years later.

---

[9] Amicus curiae makes the additional argument that, even if the Workers' Compensation Act does not bar plaintiff's civil action for wrongful termination, the trial court still has no power to award damages for industrial injuries. Because no party took this position in a lower court, we do not address the issue.

Nor does the workers' compensation argument, taken on its own terms, compel a contrary conclusion. Subject to certain statutory exceptions not here applicable, the Workers' Compensation Act in pertinent part provides: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . ." (Lab. Code, § 3600, subd. (a).) Further, "[w]here the conditions of compensation" exist, the right to recover such compensation is the "exclusive remedy" for injury or death of an employee against the employer or coemployee acting within the scope of his or her employment. (Lab. Code, § 3602, subd. (a).)

As we explained recently in *Shoemaker* v. *Myers, supra,* 52 Cal.3d 1, 16: "[T]he legal theory supporting such exclusive remedy provisions is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort. [Citations]."

The seemingly straightforward trade-off of this so-called compensation bargain is deceiving, however. Indeed, as we observed in *Shoemaker* v. *Myers, supra,* "this court and the Courts of Appeal have struggled with the problem of defining the scope of these exclusive remedy provisions." (52 Cal.3d at p. 15.) In *Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d 148, for example, we held that the workers' compensation law preempted an aggrieved employee's claim of intentional infliction of emotional distress, explaining: "An employer's supervisory conduct is inherently 'intentional,' " and "it would be unusual for an employee *not* to suffer emotional distress as a result of an unfavorable decision by his employer." (*Id.* at p. 160.) Therefore, where the acts attributed to the employer constitute a "normal part of the employment relationship," such as a discharge, demotion, discipline or criticism, an employee may not avoid the exclusive remedy provisions of the Labor Code merely by characterizing the employer's decision as one calculated to cause severe emotional disturbance. (*Ibid.*)[10]

---

[10]We noted in *Cole* that actions for intentional infliction of emotional distress against an employer were upheld in *Agarwal* v. *Johnson, supra,* 25 Cal.3d 932, and *Alcorn* v. *Anbro Engineering* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216], but neither case considered the exclusive remedy provisions of the Labor Code. *Cole* also noted that a number of cases have held a civil action for intentional infliction of emotional distress is not barred where an

Nevertheless, we also recognized in *Cole* that the scope of the Workers' Compensation Act is not universal. We summarized the exceptions in *Shoemaker* v. *Myers, supra,* 52 Cal.3d 1, as follows: "[I]n *Cole* we also identified a number of instances in which the exclusive remedy provisions are not applicable . . . . [¶] [T]he exclusive remedy provisions are not applicable under certain circumstances, sometimes variously identified as 'conduct where the employer or insurer stepped out of their proper roles,' (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d 148, 161; *Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 630 [102 Cal.Rptr. 815, 498 P.2d 1063]; see also *Johns-Manville Products Corp.* v. *Superior Court* [(1980)] 27 Cal.3d 465, 477-478 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758]), or 'conduct of an employer having a "questionable" relationship to the employment' (*Cole, supra,* 43 Cal.3d 148, 161; *Magliulo* v. *Superior Court* (1975) 47 Cal.App.3d 760, 779 [121 Cal.Rptr. 621]), but which may be essentially defined as not stemming from a risk reasonably encompassed within the compensation bargain. [Citations]." (*Id.* at p. 16.)

When an employer's decision to discharge an employee results from an animus that violates the fundamental policy of this state proscribing any interference in the official investigation of sexual harassment (Gov. Code, § 12975), such misconduct cannot under any reasonable viewpoint be considered a "normal part of the employment relationship" (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160) or a "risk reasonably encompassed within the compensation bargain." (*Shoemaker* v. *Myers, supra,* 52 Cal.2d at p. 16.) The obligation to refrain from such conduct is a "duty imposed by law upon all employers to implement the fundamental public policies" of the state (*Tameny, supra,* 27 Cal.3d at p. 176); it cannot be bargained away (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 670, fn. 12); it is not preempted by other statutory remedies (*Rojo* v. *Kliger, supra,* 52 Cal.3d 65); and its breach is most assuredly not a "normal" risk of the employment relationship subject to the exclusive remedy provisions of the Labor Code.

Sentry suggests, nevertheless, that there is something "anomalous" in restricting the recovery of an employee who incurs a standard "industrial" injury, while extending a tort remedy, including emotional distress damages, to one who suffers similar injuries from sexual or racial discrimination. The answer is that the two employees are *not* similarly situated. We emphasized the difference in *Tameny,* when we recognized that " 'public policy and sound morality' " set the latter apart: " 'It would be obnoxious to the interests of the state and contrary to public policy and sound morality to

---

employee suffers emotional distress without any accompanying physical injury or disability. (43 Cal.3d at pp. 155-156.) However, that was not the case here, and we therefore need not address the issue.

allow an employer to discharge any employee . . . on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. . . .' " (27 Cal.3d at p. 173, quoting *Petermann* v. *International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184, 188-189.) Accordingly, we held that such a discharge "subject[s] the employer to liability for compensatory and punitive damages under normal tort principles." (27 Cal.3d at p. 169.)

The same core values that underlay our holding in *Tameny* explain why such misconduct cannot be deemed "a risk reasonably encompassed within the compensation bargain." As we explained in *Foley* v. *Interactive Data Corp., supra:* "What is vindicated through the [*Tameny*] cause of action is not the terms or promises arising out of the particular employment relationship involved, but rather the public interest in not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy." (47 Cal.3d at p. 667, fn. 7.) Just as the individual employment agreement may not include terms which violate fundamental public policy (*ibid.*), so the more general "compensation bargain" cannot encompass conduct, such as sexual or racial discrimination, "obnoxious to the interests of the state and contrary to public policy and sound morality."

In sum, we hold that the Workers' Compensation Act does not preempt plaintiff's *Tameny* action for tortious discharge in contravention of fundamental public policy. The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join in affirming the judgment. As the majority correctly concludes, plaintiff Vincent A. Gantt's employer violated public policy, as embodied in Government Code section 12975 (see also, Lab. Code, § 1102.5), when it constructively discharged him for refusing to testify untruthfully or to withhold testimony in the course of an agency investigation. Plaintiff is therefore entitled to his damages for wrongful discharge in violation of public policy. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373]; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) I agree also that this recovery poses no conflict with the exclusive remedy provisions of the workers' compensation law.

I write separately for two reasons. First, I wish to emphasize that, as the majority opinion states (maj. opn., *ante*, p. 1086 & fn. 2), this court has not addressed plaintiff's alternate theory of recovery, namely, that his employer

violated public policy when it discharged him for reporting ongoing illegal activity within the company (here, the sexual harassment of plaintiff's coworker). Thus, nothing in the majority opinion should be read as calling into question those decisions recognizing this theory of recovery. (See, e.g., *Collier* v. *Superior Court* (1991) 228 Cal.App.3d 1117 [279 Cal.Rptr. 453]; *Jenkins* v. *Family Health Program* (1989) 214 Cal.App.3d 440 [262 Cal.Rptr. 798]; *Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525 [249 Cal.Rptr. 5]; *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159].)

My second reason for writing separately is to respond to the majority's statement that a cause of action for wrongful termination in violation of public policy may be based only on public policies expressed in constitutional or statutory provisions. Plaintiff never attempted to articulate a public policy not grounded in a statute or a constitutional provision. Nevertheless, this court insisted that the parties brief the issue, and now purports to decide it. This purported decision is doubly misguided. The issue is not raised by the facts of the case or the contentions of the parties, so the majority's comments are purest dicta. And, "[a]s so often happens when a court reaches beyond the confines of the case before it to render a gratuitous advisory opinion, the majority decides the issue incorrectly." (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 77 [266 Cal.Rptr. 139, 785 P.2d 522] [conc. & dis. opn. of Kaufman, J.].)

Courts should confine their decisions to issues actually raised on the facts of a case. The United States Supreme Court has explained its reluctance to issue "advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multi-faceted situation embracing conflicting and demanding interests . . . ." (*United States* v. *Fruehauf* (1961) 365 U.S. 146, 157 [5 L.Ed.2d 476, 483, 81 S.Ct. 547].) Similarly, we have stressed that " '[t]he rendering of advisory opinions falls within neither the function nor the jurisdiction of this court.' " (*Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300].) Witkin has labeled this form of judicial activism, "Have Opinion, Need Case." (Witkin, Manual on Appellate Court Opinions (1977) § 85, p. 155.)

The question whether an action for wrongful discharge may ever be based on a public policy not originating from statutory or constitutional provisions should await a case in which the public policy at issue has some nonstatutory and nonconstitutional basis. We should not decide this issue in a complete factual vacuum. Because the majority has chosen to address this issue and analyzed it in a faulty fashion, I feel compelled to respond.

As the majority acknowledges, courts have for many decades recognized that public policy may legitimately originate not only from constitutional provisions and legislative enactments, but also from other sources. (Maj. opn. *ante*, pp. 1091-1094.) These sources include the decisional law of appellate courts, executive orders, administrative regulations and decisions, and rules of professional conduct. For example, in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], relying on the judicial development of the common law and on a federal executive department order, this court held that a labor union could not discriminate against members on the basis of race.

After quoting from many cases that present various views on the application of public policy in general and in the wrongful discharge context, the majority concludes, with only perfunctory analysis, that its rule that a wrongful discharge cause of action may be based only on public policies expressed in constitutional or statutory provisions "strikes the proper balance" because "[t]he employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes . . . ." (Maj. opn., *ante*, p. 1095.) This creates the impression that only statutes or constitutional provisions provide employers with adequate notice of what is forbidden by public policy, and that it is somehow unfair for employers to be bound by other legitimate sources of public policy. This is wrong. Other legitimate sources of public policy, such as judicial decisions or codes of professional ethics, for instance, are readily available to employers or their counsel and thus provide no less "notice" than do statutes or constitutional provisions.

Implicit in the majority's objection to requiring employers to adhere to fundamental public policy set forth in published sources other than statutes or constitutional provisions is the notion that other sources express policies that are not "fundamental" or "substantial" enough. It may be somewhat easier to characterize as "fundamental" a public policy that is plainly based on the terms of a statute or constitutional provision than to so characterize one that is not so based. But it is a mistake to assume that only those policies based on statutes or constitutional provisions are firmly established and important.

An example is helpful. In *Verduzco* v. *General Dynamics, Convair Div.* (S.D.Cal. 1990) 742 F.Supp. 559, the plaintiff, a production supervisor for a national defense project, alleged that he was terminated because he complained that workers without required security clearances had access to restricted documents, and that "security was so lax that workers at the plant could walk off with blueprints and other material," compromising the national security of the United States. (*Id.* at p. 560.)

The federal court found no statute that addressed this issue; it stated that "Verduzco is asking this court to recognize a public policy that is not based on or derived from a statute." (*Verduzco* v. *General Dynamics, Convair Div.*, *supra*, 742 F.Supp. at p. 560.) Nevertheless, applying California law on wrongful termination, the court held that Verduzco had stated a cause of action for retaliatory dismissal in violation of "a fundamental public interest in preventing unauthorized persons from obtaining access to important technical data relating to military projects." (*Id.* at p. 562.)

Under the majority's approach, a plaintiff in Verduzco's position could be discharged without fear of consequences, because he could point to no statute or constitutional provision that was violated by his discharge. But the absence of a statute or constitutional provision should not prevent the recognition of a fundamental public policy in preserving national security that would be violated by the dismissal of an employee who complained that national security was compromised by lax procedures. Indeed, because the policy "inures to the benefit of the public at large rather than to a particular employer or employee," our cases demand its recognition. (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 669; accord, *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 90 [276 Cal.Rptr. 130, 801 P.2d 373].)

Other examples are no doubt available. But the point is plain. Courts should not be foreclosed from adjudicating wrongful discharge cases based on violations of public policy springing from nonstatutory and nonconstitutional sources. The majority's attempt to constrain the development of the law in a one-size-fits-all judicial straightjacket ignores the essential wisdom of the common law: law is best developed case by case, with attention to the facts of particular cases and the patterns of cases as they develop over time.

Mosk, J., concurred.