**Frank HAGAN, Plaintiff,**

v.

**FELD ENTERTAINMENT, INC. d/b/a Ringling Bros. and Barnum & Bailey Circus, Defendant.**

No. ACT. 2:04CV663.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 15, 2005.

Amberley G. Jochens, Esquire, Saunders Barlow Riddick Babineau Farmer & Brewbaker, P.C., Suffolk, VA, Lisa A. Bertini, Esquire, Norfolk, VA, Counsel for Plaintiff.

Susan R. Blackman, Esquire, Brett A. Spain, Esquire, Willcox & Savage, Norfolk, VA, Eugene D. Gulland, Esquire, Covington & Burling, Washington, DC, Counsel for Defendant.

## OPINION AND ORDER

REBECCA BEACH SMITH, District Judge.

This matter is before the court on plaintiff's motion to remand and defendant's motion to dismiss. For the reasons outlined below, plaintiff's motion to remand is **GRANTED** in part and **MOOTED** in part. Defendant's motion to dismiss is **GRANTED** in part and **DENIED** in part.

### I. Factual and Procedural History

Plaintiff, Frank Hagan ("Hagan"), is a resident and citizen of Virginia. (Compl.¶ 1). Defendant, Feld Entertainment, Incorporated ("Feld"), is a Virginia corporation with its principal place of business in Virginia. (Compl.¶ 2). Beginning in March 1993, Hagan was hired by Feld to work for Ringling Bros. and Barnum & Bailey Circus ("Ringling Bros."). (Compl.¶ 4). Hagan worked intermittently for Feld from March 1993 until 2000. (Compl.¶ 4). Beginning on or about March 7, 2000, Hagan worked continuously for Feld without interruption until he was terminated on July 21, 2004. (Compl.¶ 5).

In December 2003 Feld assigned Hagan to work as a lion handler for Ringling Bros. (Comp.¶ 6). As part of his job, he fed and watered the lions, cleaned their cages, cared for their transport on the train, and cared for them at the performance site. (Compl.¶ 7). He spent between twelve and fourteen hours every day with the lions. (Compl.¶ 8).

On or about 11:00 a.m. on July 12, 2004, the Ringling Bros. train left Phoenix, Arizona, headed for Fresno, California. (Compl.¶ 10). At the three train stops during the day, Hagan checked on the lions, during which time the lions seemed healthy. The next day, July 13, 2004, Hagan watered down the lions at approximately 8:30 a.m. (Compl.¶ 12). That day the train traveled through the Mojave desert where temperatures reached upwards of one hundred degrees. (Compl.¶ 13). At approximately 9:30 a.m. Hagan called Ringling Bros.' Train Master Gene Petis ("Petis") to inform him that the train needed to be stopped so that Hagan could again water down the lions. (Compl.¶ 14). Petis advised Hagan that the train could not stop because it was behind schedule. (Compl.¶ 15). Thereafter Jarak, another lion handler, attempted without success to contact Jeff Steele, General Manager of Ringling Bros., to request a train stop to water down the lions. (Compl.¶ 17). Finally, at 2:45 p.m., the train stopped in Arizona. (Compl.¶ 19). Between 8:30 a.m. and 2:45 p.m. the lions had no drinking water and they were not watered down. (Compl.¶ 18).

When the train stopped, Hagan immediately went to the lion car where he discovered that a two-year-old lion named Clyde was unresponsive and was lying in the fetal position with his tongue hanging out, eyes rolled back in his head, and barely breathing. (Compl.¶¶ 19, 20). When Hagan placed his hands on Clyde in an attempt to help him, he realized that Clyde's body was extremely hot. (Compl.¶ 21). As Hagan attempted to help Clyde, the lion died. (Compl.¶ 21). After sitting and crying with Clyde's body for a period of time, Hagan once again tried to contact Steele, but was unsuccessful. He was, however, able to reach Ringling Bros.' Operations Manager, John Griggs ("Griggs"), who told him to move Clyde's body to the meat

truck and to not say a word about it to anyone. (Compl.¶¶ 22, 23).

The train arrived in Fresno, California, shortly before midnight on July 13, 2004. On or about July 14, 2004, Hagan was ordered to move Clyde's body from the meat car to a Ryder rental truck. (Compl.¶ 25). He was also ordered to pressure wash the meat car to remove Clyde's hair and blood before the United States Department of Agriculture ("U.S.D.A.") inspectors arrived. (Compl.¶ 26). When the U.S.D.A. inspectors arrived, Hagan was taken to another location where he was questioned by Feld's legal counsel. (Compl.¶ 27). Hagan was told not to talk to anyone about Clyde's death, which Hagan understood to mean no conversations with the U.S.D.A. inspectors. (Compl.¶ 27). Hagan continued to talk about Clyde's death and was threatened and intimidated by Steele not to talk about it with anyone. (Compl.¶¶ 28, 29). On July 21, 2004, while still in California, Hagan was terminated and he and his daughter were left in California with no way to get home. (Compl.¶¶ 30, 31). The reason given for the termination was that Hagan caused a power outage. (Compl.¶ 31).

On October 8, 2004, plaintiff filed a Motion for Judgment in the Norfolk Circuit Court; an Amended Motion for Judgment was filed on October 13, 2004. Plaintiff asserts claims of wrongful discharge and intentional infliction of emotional distress ("emotional distress"). On November 4, 2004, defendant filed a notice of removal to federal district court on the grounds that plaintiff's claims are completely preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. On November 12, 2004, defendant filed a motion to dismiss. On December 8, 2004, plaintiff filed a response to the motion to dismiss and defendant filed a reply on December 16, 2004. On December 3, 2004, and December 8, 2004, plaintiff filed motions to remand the case to state court.[1] Defendant responded to the remand motion on December 16, 2004. All outstanding motions are ripe for review.

## II. Analysis

■■■ Plaintiff seeks this court to remand the action, based on a lack of subject matter jurisdiction. The removal statute states that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The burden of establishing federal jurisdiction is on the party seeking removal. *See Wagner v. Regent Investments, Inc.,* 903 F.Supp. 966, 968 (E.D.Va.1995). Furthermore, "because removal jurisdiction raises significant federalism concerns, its application should be strictly construed. If federal jurisdiction is doubtful, a remand is necessary." *Id.* at 968.

■■■ A defendant may remove a case from state court to any federal court that would have had original jurisdiction over the case. 28 U.S.C. § 1441(a). Thus, the propriety of defendant's removal of plaintiff's state law claims depends on whether this court had original jurisdiction over the case. Federal district courts are courts of limited jurisdiction, having subject matter jurisdiction only if there is a federal question or the parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1332. There is no diversity jurisdiction in this case, as both parties are citizens of Virginia. In order to determine whether there is federal question jurisdiction, courts use the well-pleaded complaint rule. Under the rule, federal question jurisdiction only exists "when a federal question is present-

---

**1.** It is unclear to the court why plaintiff filed two motions, as the two motions are identical.

ed on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Generally, a plaintiff may avoid federal court jurisdiction by relying exclusively on state law claims.

An important exception to the well-pleaded complaint rule is the doctrine of "complete preemption." Under the complete preemption doctrine, federal law can so completely preempt state law that "any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law," and is removable to federal court. *Franchise Tax Bd. v. Constructive Laborers Vacation Trust,* 463 U.S. 1, 24, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The state law claim is transformed into a federal claim for purposes of the well-pleaded complaint rule. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 65, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

In the case at bar, defendant argues that while plaintiff only alleged state law claims in his complaint, plaintiff's state law claims are completely preempted by federal law because plaintiff and defendant are parties to a collective bargaining agreement. Section 301 of the Labor Management Relations Act of 1947 (" § 301") grants federal courts jurisdiction over cases involving collective bargaining agreements and authorizes federal courts to establish a body of federal law interpreting collective bargaining agreements. *See Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Additionally, "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is pre-empted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute." *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 406, 108

S.Ct. 1877, 100 L.Ed.2d 410 (1988). However, if the state law cause of action is independent from the collective bargaining agreement, meaning that resolution of the state law claim does not require interpretation of the collective bargaining agreement, the state law claim is not preempted. *See id.* at 413, 108 S.Ct. 1877. Thus, in order to determine whether the plaintiff's state law claims are preempted by federal law, it is necessary to determine whether an interpretation of the collective bargaining agreement is required to resolve the state law claims.

Furthermore, because the preemptive effect of § 301 is dependent upon the elements of the state law claims, "a federal district court has the discretion to address the validity of the alleged state-law claim during the course of its preemption inquiry." *Childers v. Chesapeake & Potomac Tel. Co.,* 881 F.2d 1259, 1262 (4th Cir.1989). If the district court determines that a colorable state law claim exists, it should then determine whether the claim is independent of the collective bargaining agreement. *See id.* Only those state law claims whose lack of merit is obvious should be dismissed. *See id.* Thus, the court first determines whether plaintiff has stated a colorable state law claim and then proceeds to determine whether such claim is preempted by § 301.

### A. Governing Law

The parties are in disagreement regarding the appropriate state law to apply to the claims at bar. Defendant argues that Virginia law should apply, whereas plaintiff states that California law should apply. This action was filed in the Eastern District of Virginia; accordingly, this federal court applies Virginia choice-of-law rules to determine which state's substantive law should apply. *See America Online, Inc. v. St. Paul Mercury Ins.*

*Co.,* 347 F.3d 89, 92 (4th Cir.2003) (holding that a federal district court applies the choice-of-law rules of the state in which it sits). Both the wrongful discharge and emotional distress claims are tort claims. Under Virginia law, "the law of the place of the wrong determines the substantive issues of tort liability . . . ." *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (1993); *see also Jones v. R.S. Jones and Assoc., Inc.,* 246 Va. 3, 431 S.E.2d 33, 34 (1993). The place of the wrong for purposes of this rule is the, "place where the last event necessary to make an actor liable for an alleged tort takes place . . . ." *Insteel Indus. v. Costanza Contracting,* 276 F.Supp.2d 479, 486 (E.D.Va.2003) (citing *Quillen v. International Playtex, Inc.,* 789 F.2d 1041, 1044 (4th Cir.1986)). Different claims may be governed by different substantive law, if the choice-influencing considerations differ amongst the claims. *See Buchanan,* 431 S.E.2d at 291. Thus, in order to determine which substantive law should apply, the court must determine the place of the wrong for each individual claim.

In regard to the wrongful discharge claim, it is clear that the place of the wrong as alleged by the plaintiff is California. Prior to his discharge, plaintiff claims that Feld told him not to talk to anyone, including U.S.D.A. investigators, about Clyde's death, and, because plaintiff continued to talk about the incident, plaintiff was fired. One of these conversations between plaintiff and Feld occurred in Arizona, but all others occurred in California. Plaintiff was discharged from his employment with Feld while in California. The actual discharge was the last event necessary to make Feld liable; thus, the wrong occurred in California and the proper substantive law to apply to that claim is California law.

It is more difficult to determine which substantive law should apply to the emotional distress claim. The plaintiff does not claim that a single act by the defendant gave rise to his emotional distress claim. Instead, a series of actions beginning in Arizona and ending in California are the basis of his emotional distress. In order to prove an emotional distress claim under Arizona, California, or Virginia law, plaintiff must show that the defendant engaged in intentional or reckless conduct that was so extreme or outrageous it caused severe emotional distress. *See, e.g., Mintz v. Bell Atlantic Systems Leasing Intern., Inc.,* 183 Ariz. 550, 905 P.2d 559, 562–63 (1995) (holding the elements of a cause of action for emotional distress are: "first, the conduct by the defendant must be extreme and outrageous; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct"); *Russo v. White,* 241 Va. 23, 400 S.E.2d 160, 162 (1991) (holding that plaintiff must prove by clear and convincing evidence that "the wrongdoer's conduct is intentional or reckless; the conduct is outrageous and intolerable; the wrongful conduct and the emotional distress are causally connected; and, the distress is severe"); *Cervantez v. J.C. Penney Co., Inc.,* 24 Cal.3d 579, 156 Cal.Rptr. 198, 595 P.2d 975, 983 (1979) ("holding the elements of a suit for intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering sever or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct").

In all of these jurisdictions, a claim of emotional distress is very difficult to maintain, and it is important to consider the totality of all acts committed by defendant in determining outrageous and extreme conduct, which acts. in this case occurred in Arizona and California. However, the last alleged act giving rise to the emotional distress claim occurred in California. Accordingly, the court will apply the substantive law of California to plaintiff's emotional distress claim. *See Insteel*, 276 F.Supp.2d at 486 (holding that, under Virginia choice-of-law principles, the proper substantive law to apply is the law of the place where the last event necessary to make an actor liable for an alleged tort takes place).

## B. Underlying State Claims

### 1. Wrongful Discharge

California recognizes the tort of ·wrongful discharge. *See Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980). A claim for wrongful discharge exists when an "employer's discharge of an employee violates fundamental principles of public policy." *Id.* at 1331. Generally, California courts have found that an employee was discharged in violation of public policy where the employee was discharged after the employee: "(1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right or privilege; or (4) reported a statutory violation for the public's benefit." *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, 1051 (1998). A claim for wrongful discharge also exists if the employee is discharged after reporting a statutory vio-

lation to management and other employees, but not to a government official or other enforcement entity. *See id.* at 1049, 1061. The statutory violation may exist at either the state or federal level. *See id.* at 1059. Additionally, an employee's allegation that a federal regulation, rather than a statute or constitution, was violated is sufficient to show that the employee was discharged in contravention of public policy. *See id.* at 1061. As a final limiting factor, the statute (or regulation) in question must be "designed to protect the public or advance some substantial public policy goal." *Id.*

Plaintiff alleges a prima facie case of wrongful discharge. He alleges that he was discharged for reporting to management and other employees a statutory violation of the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.*, and the California Penal Code § 597 *et seq.* (prohibiting cruelty to animals).[2] The Animal Welfare Act ("the Act") authorizes the Secretary of Agriculture to promulgate standards and rules governing the humane handling, care, treatment and transportation of animals by exhibitors. 7 U.S.C. § 2143(a). Pursuant to this grant of rulemaking authority, the Secretary of Agriculture promulgated rules requiring that animals in transit be observed at least once every four hours to ensure that ambient temperature is within a specified range and that animals are not in physical distress. 9 C.F.R. § 3.140. If animals are in obvious physical distress, the carrier is required to provide veterinary care as soon as possible. 9 C.F.R. § 3.140. Live animals are not to be subjected to surrounding air temperatures in excess of 85 degrees Fahrenheit and care

---

**2.** While some of Feld's actions may have been criminal under the California penal statute had they occurred in California, the actions occurred in Arizona, not California. Thus, it is unclear whether the California penal stat-

ute could serve as a public policy source in this case. However, as the Animal Welfare Act and regulations clearly qualify as a public policy source, it is unnecessary for the court to make this determination.

must be taken to ensure that animals do not suffer physical trauma. 9 C.F.R. § 3.142. The facts as alleged by plaintiff indicate that these regulations were violated when no one observed the lions for over six hours, the ambient air temperature was greater than it should have been, and care was not taken to insure that animals suffered no physical distress. Allegedly, as a result of these violations, a lion died and plaintiff was fired because he complained to management and other employees about violations of the Animal Welfare Act.

 While it may be difficult to determine what constitutes a public policy source, at the core it must have a legislative root and be of fundamental concern to the general public, rather than to an individual. *See Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680, 684, 687–88 (1992). In order to meet the first prong, that the public policy has a legislative root, a plaintiff's public policy source in a wrongful discharge claim must be tethered to a statutory or constitutional provision. *See Green*, 78 Cal.Rptr.2d 16, 960 P.2d at 1051. A regulation that accomplishes the purpose of a statute is properly tethered to a public policy source. California courts recognize that "if a statute that seeks to further a public policy objective delegates the authority to adopt administrative regulations to an administrative agency in order to fulfill that objective, and that agency adopts regulations that are within the scope of its statutory policy, then those regulations may be manifestations of important public policy." *Id.* at 1056.

The regulations accompanying the Animal Welfare Act are closely related to the statutory language and advance the stated purpose of the Animal Welfare Act. The stated purpose of the Act is "to insure that animals intended for use ... for exhibition purposes ... are provided humane care and treatment." 7 U.S.C. § 2131. The Act grants the Secretary of Agriculture the authority to promulgate rules and standards to govern the humane handling of animals. The Secretary is directed to set minimum standards for "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care ... necessary for humane handling, care or treatment of animals." 7 U.S.C. § 2143. The rules and standards promulgated under this grant of power are found in 9 C.F.R. 3 *et seq.* The rules that defendant allegedly violated about which plaintiff complained, namely failure to observe animals at regular intervals, failure to water animals properly, failure to maintain proper handling temperatures, and failure to prevent physical distress, directly flow from the legislative grant of power to the Secretary in 7 U.S.C. § 2143. Furthermore, these regulations carry out the stated purpose of the Act in insuring that animals in interstate commerce are treated humanely. *See* 7 U.S.C. § 2143. In sum, while the alleged violations by the defendant are regulatory in nature, they are sufficiently tethered to a statute to constitute public policy.

 The Animal Welfare Act and accompanying regulations further an important public policy concern, the welfare of animals in commerce, thereby meeting the final limiting factor of California law for a wrongful discharge claim. *See Green*, 78 Cal.Rptr.2d 16, 960 P.2d at 1061; *Gantt*, 4 Cal.Rptr.2d 874, 824 P.2d at 684, 687–88. There are two primary factors California courts look to in determining whether a statute furthers public policy. First, the matter must affect "society at large rather than a purely personal or proprietary interest of the plaintiff." *Gantt*, 4 Cal. Rptr.2d 874, 824 P.2d at 684. The Act clearly benefits society at large rather than the personal interests of the plaintiff.

The Act is designed to insure that the nation's animals in interstate commerce are treated in a safe and humane manner. Society as a whole, rather than an individual such as the plaintiff, benefits from the humane handling of animals. In examining whether the Act was meant to protect the public, the District of Columbia Circuit found that "the legislative history of both the 1985 amendments to the Animal Welfare Act and the 1970 act that first included animal exhibitions within the AWA confirms that Congress acted with the public's interest in mind." *Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 444 (D.C.Cir.1998). The Act was designed to benefit the public at large rather than specific individuals.

Second, the matter must be fundamental, substantial, and well-established at the time of the wrongful discharge. *See Gantt,* 4 Cal.Rptr.2d 874, 824 P.2d at 684. The Act and its accompanying regulations are fundamental. The statement of policy accompanying the Act states that it is "essential" to regulate how animals are treated in interstate commerce. 7 U.S.C. § 2131. The statute is substantial in that it sets out a broad-based statutory and regulatory framework for the treatment of animals used in research facilities, for exhibition purposes, and for pets. It is the "core federal statute regulating animal use and abuse." *United States v. Thompson,* 118 F.Supp.2d 723, 724 (W.D.Tex.1998). The public policy embodied in the statute of treating animals humanely is well-established; the statute was originally passed in 1966. Its requirements were made applicable to exhibitors, such as circuses showcasing animals, in 1970. Pub.L. 91–579

(1970), as codified in 7 U.S.C. § 2131. Defendant has been on notice since that time of the policy purpose of the Act.

In sum, plaintiff has presented a prima facie case of wrongful discharge under California law. As alleged, he was fired after complaining to management about violations of a federal statute. A colorable state law claim has been made, and the court **DENIES** defendant's motion to dismiss the wrongful discharge claim. The court must now determine whether the claim has been preempted by § 301.

### 2. Intentional Infliction of Emotional Distress

Plaintiff asserts a claim of emotional distress against his employer Feld Entertainment. Under California's Labor Code, the state's workers' compensation system generally provides the sole remedy for an employee's injury sustained on the job. *See, e.g., Fermino v. Fedco, Inc.,* 7 Cal.4th 701, 30 Cal.Rptr.2d 18, 872 P.2d 559, 561 (1994).[3] In particular, an employee cannot bring a civil suit for physical or emotional injury, or both, if the injury occurred during the normal course of the employment relationship. *See, e.g., Livitsanos v. Superior Court,* 2 Cal.4th 744, 7 Cal.Rptr.2d 808, 828 P.2d 1195, 1201–02 (1992); *Cole v. Fair Oaks Fire Protection Dist.,* 43 Cal.3d 148, 233 Cal. Rptr. 308, 729 P.2d 743, 748–50 (1987)(rule applies when employer is guilty of "intentional," even "malicious or deceitful," misconduct).

In determining whether worker's compensation is the exclusive remedy,

---

**3.** An important exception to the rule is that worker's compensation is not the sole remedy where an employee is wrongfully discharged in violation of public policy. *See Fermino,* 30 Cal.Rptr.2d 18, 872 P.2d at 566 (citing *Gantt,* 4 Cal.Rptr.2d 874, 824 P.2d at 691). A wrongful discharge in violation of public policy "cannot under any reasonable viewpoint be considered a normal part of the employment relationship." *Gantt,* 4 Cal.Rptr.2d 874, 824 P.2d at 691 (internal citations omitted). Thus, plaintiff's wrongful discharge claim is not preempted by workers' compensation law.

the court must look at whether the actions of misconduct attributed to the employer are "a normal part of the employment relationship." *Cole*, 233 Cal.Rptr. 308, 729 P.2d at 750. Actions such as "demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances" are all part of the normal employment relationship, even if the actions can be characterized as unfair or outrageous. *Id.* All of the actions of which plaintiff complains in regard to his emotional distress claim, while arguably outrageous, involved a normal part of the employment relationship. As pled by plaintiff, the claim for emotional distress arises from defendant's actions in regard to plaintiff's job of taking care of the lions: defendant's refusing to stop the train for watering down and water for the lions, at plaintiff's request; having plaintiff dispose of Clyde's body; directing plaintiff to clean the area where Clyde's body was stored; and telling plaintiff not to discuss Clyde's death. These are all actions incident to plaintiff's normal employment of taking care of the lions. The defendant's conduct itself may have been abnormal and inhumane, making the circumstances surrounding Clyde's death distasteful or outrageous. However, the acts constituting defendant's misconduct all occurred during the normal course of the employment relationship between plaintiff and defendant, and were part of that relationship. The circumstances of Clyde's death did not change plaintiff's job duties to take care of the lions, rather defendant's actions may have kept plaintiff from properly performing his job.[4]

Plaintiff has not stated a colorable state law claim for emotional distress under California law, and the court **DISMISSES** plaintiff's claim for emotional distress.[5] Plaintiff's motion to remand the claim for emotional distress is thereby **MOOT**.

## C. *Preemption Under § 301*

Section 301 of the Labor Management Relations Act ("LMRA") provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. . .

29 U.S.C. § 185. This section gives federal courts jurisdiction over cases involving collective bargaining agreements and authority to establish federal common law to resolve such cases. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *McCormick v. AT & T Technologies, Inc.*, 934 F.2d 531, 534 (1991).

The Supreme Court has been consistent in holding that § 301 preempts state law claims, only when resolution of the state law claim requires interpretation of a collective bargaining agreement. In *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the underlying state law issue was whether a collective bargaining agreement implicitly pro-

---

4. The actions constituting the misconduct complained of in the case at bar were committed by the defendant. Plaintiff has not alleged that defendant *requested him* to perform an illegal activity. *But see supra* note 2. A request by an employer for an employee to commit an illegal act is not part of the normal employment relationship. To the extent that

defendant instructed plaintiff not to discuss Clyde's death with the U.S.D.A., there is no "whistle-blower" provision in the Animal Welfare Act.

5. A claim for emotional distress is extremely difficult to maintain under Arizona, California, or Virginia law. *See supra* Part II.A.

hibited a union strike. The Washington state court held that state contract interpretation rules applied. The Supreme Court reversed, holding that federal common law applied and § 301 preempted the claim. *Id.* at 102, 82 S.Ct. 571. In *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206, the Court considered whether the Wisconsin tort for bad-faith handling of an insurance claim in a case involving a claim for disability benefits authorized by a collective bargaining agreement, was preempted by § 301. Following the reasoning articulated in *Lucas Flour,* the Court in *Allis–Chalmers* held that because the tort grew from a breach of a duty implied in a collective bargaining agreement that the claim was preempted by § 301. 471 U.S. at 220–21, 105 S.Ct. 1904.

Applying the same reasoning to a factually different case, the Court in *Lingle,* 486 U.S. 399, 108 S.Ct. 1877, held that a retaliatory discharge claim was not preempted by § 301. In order for the plaintiff in *Lingle* to prove her underlying state claim, she was required to show that she was discharged, or threatened to be discharged, and the employer's motive was to deter her from exercising her rights under the Illinois Worker's Compensation Act. *Id.* at 406–07, 108 S.Ct. 1877. While the plaintiff in *Lingle* was covered by a collective bargaining agreement, it was unnecessary to look to the collective bargaining agreement in resolving the retaliatory discharge claim. *Id.* at 407, 108 S.Ct. 1877. Therefore, the retaliatory discharge claim existed outside the collective bargaining agreement and was not preempted by § 301. *See id.* at 413, 108 S.Ct. 1877.

■ Plaintiff's wrongful discharge claim at bar is similar to that in *Lingle.* Because a prima facie claim for wrongful discharge exists if plaintiff was discharged from employment in violation of public policy, and existence or non-existence of a prima facie case does not depend on the provisions of the collective bargaining agreement, § 301 does not preempt plaintiff's state law claim. A court need not interpret any provision of the collective bargaining agreement between plaintiff and defendant. Feld's obligation to refrain from discharging Hagan does not depend on an express or implied promise set forth in the collective bargaining agreement, but instead reflects a duty imposed by law on all employers in California in order to implement fundamental public policies embodied in statutes, constitutions, and regulations. *See Tameny,* 164 Cal. Rptr. 839, 610 P.2d at 1335. Furthermore, the California Supreme Court, in dicta, specifically stated that the tort of wrongful discharge is "not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others." *Green,* 78 Cal.Rptr.2d 16, 960 P.2d at 1053.

Finally, while defendant has the burden of proving jurisdiction, defendant fails to identify any provision of the collective bargaining agreement that a court would need to interpret in resolving plaintiff's wrongful discharge claim. In fact, defendant's response to plaintiff's motion to remand lacks any argument as to why § 301 preempts the wrongful discharge claim under California law.[6] Instead, defendant ar-

6. Defendant does make an argument in its memorandum in support of its motion to dismiss as to why the wrongful discharge claim is preempted by § 301. However, the argument relies solely on Virginia's failure to recognize a wrongful discharge claim when a collective bargaining agreement exists. As there is no California case law prohibiting a person working under a collective bargaining agreement from bringing a wrongful discharge claim, defendant's argument under Virginia law is not on point. Although this case was filed in Virginia, plaintiff's complaint clearly cites to California law, and this court's choice-of-law analysis agrees with plaintiff. *See supra* Part II.A.

gues that the court has jurisdiction because § 301 preemption of the emotional distress claim then provides supplemental jurisdiction over the wrongful discharge claim.[7] The emotional distress claim has been dismissed; thus, there is no preemption of the emotional distress claim, much less supplemental jurisdiction flowing from its preemption. Since plaintiff's wrongful discharge claim does not rely on an interpretation of the collective bargaining agreement, § 301 does not preempt this valid state law claim.

### III. Conclusion

For the reasons set forth above, defendant's motion to dismiss plaintiff's wrongful discharge claim is **DENIED**, and defendant's motion to dismiss the emotional distress claim is **GRANTED**. Plaintiff's state wrongful discharge claim is not preempted by federal law, and consequently there is no federal question jurisdiction under 28 U.S.C. § 1331. As there is no federal question or diversity jurisdiction, the court **REMANDS** plaintiff's wrongful discharge claim to the Circuit Court for the City of Norfolk, Virginia, for all further proceedings.[8] The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for plaintiff and defendant, and to the Circuit Court of the City of Norfolk. Further, the Clerk shall take the necessary steps to effect the remand to the state court.

**IT IS SO ORDERED.**

---

7. Yet, defendant argues that plaintiff's emotional distress claim should be dismissed for failure to state a claim. Despite making the argument to dismiss the emotional distress claim, defendant fails to anticipate that the emotional distress claim may be dismissed, in which case the court would not have supplemental jurisdiction over the wrongful discharge claim, absent preemption of it.

8. Plaintiff's motion to remand plaintiff's emotional distress claim is **MOOT** due to its dismissal.