[No. H010413. Sixth Dist. Mar. 2, 1993.]

SEQUOIA INSURANCE COMPANY et al. Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
ROBERT A. NORDEN, Real Party in Interest.

**COUNSEL**

Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, Richard R. Pace and Donn Dimichele for Petitioners.

No appearance for Respondent.

McGuinn, Hillsman & Palefsky, John A. McGuinn and Keith A. Ehrman for Real Party in Interest.

## OPINION

**PREMO, J.**—In this writ proceeding, we consider whether a cause of action is stated for wrongful termination in violation of public policy when the employer's conduct is not specifically prohibited by a statutory or constitutional provision. We conclude that such a provision is a foundational requirement to establish wrongful termination on public policy grounds. Accordingly, we hold that the superior court erred in denying defendant employer's motion for summary adjudication of the wrongful termination cause of action in this case. We grant a writ of mandate to obviate an expensive and complex trial of a legal issue which, as a matter of law, must be resolved in the employer's favor.

### BACKGROUND

For purposes of this proceeding, we will summarize only the undisputed facts leading to the termination at issue. Plaintiff Robert Norden was hired as claims manager by Sequoia Insurance Company (hereafter, Sequoia) in 1976. In 1979, his title was changed to vice-president. In 1987, Sequoia was acquired by defendant QBE Insurance Limited, an Australian insurance and reinsurance group. In connection with the transfer of ownership, plaintiff acknowledged in writing that his employment was terminable at will. Defendant Michael Moody was named president of Sequoia in late February 1990.

In November 1988, the voters of California passed Proposition 103, adding article 10 to the Insurance Code (§ 1861 et seq.) for the express purpose of reducing and controlling insurance rates. After assuming the presidency of Sequoia, Moody observed that a number of large, late increases in case reserves were appearing in the claims department.[1] Moody told plaintiff that he believed the higher reserves on these cases should have been set earlier. Later, Moody expressed his opinion to plaintiff that a pattern of large, late reserves had developed at Sequoia. Plaintiff disagreed with this assessment, believing that "for the most part" adequate case reserves were being implemented on a timely basis. In June 1990, Moody sent plaintiff a memo expressing extreme concern about late reserve development. Although Moody never directly ordered plaintiff to increase the case reserves for all pending claims, he openly disagreed with the perceived overall practice by the claims department of establishing low case reserves and ultimately spending millions of dollars on attorney fees disputing

---

[1]As described by plaintiff, "case reserves" are amounts of money set aside by the company as an estimate of the reasonable amount the company will ultimately be required to pay on a claim.

liability for claims. Nevertheless, plaintiff received favorable performance evaluations, rating him either "satisfactory" or "excellent" in 19 out of 20 categories, with an overall rating of "satisfactory."

In July 1990, Moody decided to activate a previously authorized position of "litigation specialist" and appoint plaintiff to the position. Plaintiff agreed that his abilities would best be utilized in the "legal-technical area" and accepted the transfer, which took effect September 4, 1990.

In August 1990, the company experienced an operating loss of over half a million dollars, its second major loss in three months. Moody concluded that the loss was due principally to excessive expenditures. Moody was also concerned that Sequoia's "A" rating with the Best's Insurance Group would decline as a result of these losses. In late September or early October 1990, Sequoia was notified that it had been placed on a "watch" list by Best's—a preliminary step, in Moody's view, to lowering Sequoia's rating, and a reflection of Sequoia's deteriorating financial condition. On September 24, 1990, Moody called a meeting of a large group of managers and explained to them the severity of Sequoia's financial situation. The meeting produced a long list of recommended cost-cutting measures. Subsequently, 18 to 20 measures were implemented, including the closure of offices in 2 cities.

On October 13, 1990, about one month after plaintiff assumed the duties of litigation director, Moody informed him that Sequoia was eliminating this position and that plaintiff's employment was terminated. According to Moody, the termination of plaintiff and five other employees was one of the company's cost-cutting measures; plaintiff's position was, in his words, "a job that we could do without." Plaintiff found this explanation "not credible," however. In May 1991, he filed suit, alleging (1) wrongful discharge in violation of public policy, (2) age discrimination, and (3) fraud and deceit.

With respect to the first cause of action, plaintiff alleged that he was terminated "for his refusal to inflate claim reserves." According to plaintiff, Sequoia was engaged in a "scheme" to defeat the purposes of Proposition 103, by artificially inflating case reserves in order to reduce its apparent profitability. By "creat[ing] the illusion of loss," Sequoia would be able to reduce the amounts it would be required to refund to customers under Proposition 103 and increase its premiums. Plaintiff was "in the way" of this scheme; although he was "pressured" to inflate case reserves, he refused to do so. In the second and third causes of action, plaintiff alleged he was fraudulently induced by Moody's false promise to accept the position of litigation director, and thereafter was terminated as part of a plan to "get rid of Sequoia's older employees."

Defendants moved for summary judgment, or in the alternative, summary adjudication of each cause of action. With respect to the first cause of action, defendants argued that there was no factual or legal foundation for a wrongful termination claim based on public policy, because there was no statutory expression of a policy against increasing case reserves. Plaintiff responded that there were numerous material factual issues precluding summary judgment. He further disputed defendants' interpretation of *Gantt* v. *Sentry Insurance Co.* (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680], on which defendants had relied, arguing that a public policy need only be *"based on* or *derived from"* a statute to support a cause of action for wrongful termination. After hearing argument on the matter, the trial court denied both summary judgment and summary adjudication, ruling by minute order that "defendant's [*sic*] notice fails to specify the matters to be adjudicated. Plaintiff adequately alleges Causes of Action for age discrimination and breach of public policy, although the proof is very thin."

DISCUSSION

Defendants assert two errors in the trial court's ruling. First, they object to the court's perception of their summary adjudication motion as inadequate for failing to specify the matters to be adjudicated. Second, they challenge the court's legal determination that a cause of action is stated for wrongful termination on public policy grounds. Plaintiff responds that summary adjudication was not warranted because *"numerous"* material issues of fact existed with respect to the wrongful termination allegations. As for the legal adequacy of this cause of action, he maintains that his claim was sufficiently rooted in public policy concerns to withstand summary adjudication.

We first consider the trial court's determination that defendants' statement of grounds for summary adjudication was deficient. The notice of motion requested summary judgment in defendants' favor, or "[a]lternatively, if for any reason summary judgment cannot be had[,] for an order adjudicating that there is no merit to the following described causes of action contained in the complaint filed herein by Robert A. Norden; and that the final judgment in this action shall, in addition to any matters determined at trial, award judgment as established by such adjudication as to the following described causes of action: discharge in violation of public policy, unlawful age discrimination, fraud and deceit, and intentional infliction of emotional distress. Said motion will be made upon the ground that there is no triable issue of material fact as to the summary judgment or summary adjudication sought and therefore the moving party is entitled to such summary judgment or summary adjudication as a matter of law."

Defendants' motion was made in August 1992, more than 18 months after the 1990 amendment to Code of Civil Procedure section 437c[2] took effect. Subdivision (f) of that statute redefines the summary adjudication process, eliminating its use for facts or issues "that do not completely dispose of a cause of action or a defense." (Stats. 1990, ch. 1561, § 1.) Accordingly, there is no longer any reason for a notice of motion to identify specific issues; a listing of the disputed causes of action, as was done here, is sufficient. The trial court's stated requirement that the "matters" at issue be more precisely identified would have been accurate under the prior system of summary adjudication (cf. *Homestead Savings* v. *Superior Court* (1986) 179 Cal.App.3d 494 [224 Cal.Rptr. 554]), but is unjustified under the present version of section 437c, subdivision (f).[3]

██ We turn next to the trial court's ruling on the legal sufficiency of the wrongful termination cause of action. Defendants' position is that plaintiff cannot succeed on this theory because he was not directed to engage in any conduct specifically enjoined by a statutory or constitutional provision. Plaintiff suggests this issue need not be reached because there were disputed issues of fact that precluded summary adjudication of this cause of action. In any event, he argues, a specific prohibition such as defendants advocate would be "absurd"; all that is required for a public policy to be stated is that it be generally *"based on* or *derived from"* a statutory or constitutional law.

Preliminarily, we find it necessary to clarify some confusion evident in plaintiff's identification of the issues. Plaintiff appears to assume that if questions of fact exist, it is not necessary to address the merits of the controversy between the parties. Plaintiff's approach, however, is backward. ██ In a case such as this, where the defendant asserts a failure of the complaint to state a cause of action, the summary adjudication motion is tantamount to a motion for judgment on the pleadings. (*C. L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483]; see also *Robinson* v. *Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1131 [228 Cal.Rptr. 591].) Defendants' motion is based on the argument that *even if* the allegations of the complaint are true, no ground for wrongful termination is stated therein. If defendants are correct, then adjudication in their favor must follow as a matter of law, and we need not reach the question whether plaintiff's opposition to the motion raises a triable issue of fact. (*C. L. Smith Co.* v. *Roger Ducharme, Inc., supra,* 65 Cal.App.3d at p. 750; *Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 5].)

---

[2]Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[3]Indeed, defendants' motion was, if anything, overly inclusive; it sought adjudication of whether plaintiff had suffered emotional distress, which had not been asserted as a separate cause of action.

Our first task, then, is to accept as true the material factual allegations of the complaint and determine whether, on those facts, plaintiff's allegation of wrongful termination in violation of public policy is legally sufficient. The answer to this question turns on the correct interpretation of our Supreme Court's most recent exposition on the subject of public policy in the employment context in *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th 1083.

In *Gantt,* the plaintiff alleged he was terminated in retaliation for supporting a coworker's claim of sexual harassment and refusing to lie to investigators from the Department of Fair Employment and Housing. The Supreme Court reaffirmed the right of an employee to sue for wrongful termination "when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn." (1 Cal.4th at p. 1090.)

The court also recognized, however, the difficulty of defining "public policy" clearly enough to distinguish truly public interests from mere private disputes between employer and employee and, at the same time, avoid "judicial policymaking" inherent in an overly broad construction of the term. Notwithstanding the division among the courts both of this state and across the country in their willingness to define this concept broadly, the *Gantt* court observed that "with few exceptions courts have, in practice, relied to some extent on statutory or constitutional expressions of public policy as a basis of the employee's claim." (*Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at p. 1094.) Even those decisions favoring a broad view, the court pointed out, have typically cautioned against declaring public policy "absent some prior legislative expression on the subject." (*Id.* at p. 1095.)

The *Gantt* court embraced a more restrictive approach, which, it reasoned, would best serve the interests of employer, employee, and the public: "These wise caveats against judicial policymaking are unnecessary if one recognizes that courts *in wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded." (1 Cal.4th at p. 1095.)

This statement evinces an intent by the Supreme Court to narrow the scope of the public policy exception to at-will employment. Plaintiff's selected references to portions of the *Gantt* opinion that mention public policy being generally "derived from" or "based on" a statute are misleading: they are taken not from the court's holding, but from its review of precedent in the area, which was fraught with conflict and uncertainty.[4] Indeed, the court acknowledged that it had *not* previously taken a position on the issue of how broadly "public policy" should be defined. In *Gantt,* however, it did adopt such a position: the fundamental policies underlying the public policy exception must be *delineated in a constitutional or statutory provision.*

A requirement that a policy be "delineated" entails more specificity than merely being "derived from" or "based" on its source. ■ To "delineate" means ". . . to describe in detail, esp. with sharpness or vividness" (Webster's Third New Internat. Dict. (1981) p. 597); ". . . to describe, portray, or set forth with accuracy or in detail" (Webster's Ninth New Collegiate Dict. (1984) p. 336). ■ Although one should not assume that the employer's *precise act* (e.g., discharging an employee for refusing to commit a crime) must be specifically prohibited for the public policy exception to apply,[5] a constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law.

In this case, the employer is accused of violating public policy by attempting to persuade plaintiff to "inflate" case reserves. Unless plaintiff can point to a specific statement in Proposition 103 or another statute which restricts the amount of reserves an insurer may set aside for the anticipated cost of a pending claim, no public policy can be inferred.

Plaintiff cannot identify such a provision. Instead, he relies on the general purpose "to be *derived* from" Proposition 103 and related sections—in his words, "to bar insurers from charging excessive rates, by ensuring that proper and non-deceitful profitability data is [*sic*] given to the Insurance

---

[4]*Dabbs* v. *Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437 [234 Cal. Rptr. 129], for example, was not cited by the *Gantt* court "with approval," as plaintiff says; on the contrary, any suggestion in *Dabbs* that public policy need not be rooted in a statute or constitution is inconsistent with the holding ultimately reached in *Gantt.* Plaintiff's other pre-*Gantt* citations likewise provide no support for his suggestion that "vague, general policies" are sufficient to protect an employee from retaliatory discharge.

[5]We mention this otherwise self-evident qualification only to disaffirm plaintiff's fallacious suggestion that if generally inferring public policy from a statute is not sufficient, the alternative must be a hypertechnical requirement that the statute proscribe the very act of which the employer is accused. Such resort to either-or reasoning contributes nothing to a balanced analysis of the *Gantt* decision. ·.

Commissioner, in order for the Commissioner to determine whether an insurer's financial condition is such that it should be allowed a rate increase." Consequently, he argues, his "conduct in refusing to participate in a scheme that aimed at *purposely misleading* the Insurance Commissioner as to Sequoia's profitability deserves to be *protected* and *encouraged*, since it upheld the clear purpose and policy of [Proposition] 103."

We must reject this reasoning. First, plaintiff's description of the purpose of Proposition 103 exaggerates the significance of the submission of data to the Insurance Commissioner. ■ In approving the initiative, the voters of California intended to "protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians." (See Historical and Statutory Notes, 42A West's Ann. Ins. Code, § 1861.01 (1993 pocket supp.) pp. 104-105.) That purpose should not be confused with the rate approval procedures, one of several mechanisms intended to further compliance with the goals of the initiative.

■ Even if we were to accept plaintiff's representation of the purpose of Proposition 103, we nonetheless can find no "direct statutory support" (*Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at p. 1096) for the argument that an insurer's adjustment or manipulation of case reserves is against public policy. An employer cannot be "bound to know" that a practice of increasing reserves at an early date in the claim process is against public policy where there is no expression of that policy anywhere in the codes under which the employer operates its business. The nexus between the public's general objective of controlling the rise of insurance rates and an insurer's disingenuous motive for an otherwise legitimate business practice is simply too tenuous to serve as a basis for finding a public policy exception to employment at will. Thus, whether the conflict between plaintiff and Moody was a reflection of fundamental differences in "case-reserving philosophy" (as Moody explained it), or, as plaintiff characterizes it, a battle between a company president trying to distort its profitability figures and an employee who "refused" to " 'go along with' " that "scheme," defendants' conduct provides no basis for recovery on a wrongful termination theory.

■ As noted earlier, where a complaint is insufficient to state a cause of action, a defendant's motion for summary judgment is in legal effect a motion for judgment on the pleadings, and factual controversies are essentially irrelevant. ■ Where judgment on the pleadings is appropriate, a court has discretion to grant the opposing party leave to amend. (*Hejmadi* v. *AMFAC, Inc., supra,* 202 Cal.App.3d at p. 536.) ■ In this case, however, we see no reasonable probability that plaintiff will be able to amend his

complaint to state a cause of action for wrongful termination in violation of public policy. Accordingly, we must conclude that defendants were entitled to judgment on the pleadings—or, as they labeled the request, summary adjudication—of this count in plaintiff's complaint.[6] (See generally, *Heredia v. Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1358 [279 Cal.Rptr. 511] [court may grant motion for judgment on the pleadings as to some of asserted counts].)

### DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order denying the motion for summary adjudication of plaintiff's first cause of action, and to enter a new order granting the motion. The stay issued by this court on November 12, 1992, is vacated.

Cottle, P. J., and Elia, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 20, 1993. Kennard, J., was of the opinion that the petition should be granted.

---

[6]Although technically this motion should have been denominated a motion for judgment on the pleadings, the ultimate result is the same: elimination of this cause of action from the controversy. For purposes of disposition, therefore, we will treat the motion as if it had properly been brought as a request for summary judgment.