Filed 11/21/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CECILIA DIEGO, | D063734 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00099381-CU-OE-CTL) |
| PILGRIM UNITED CHURCH OF CHRIST, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge. Affirmed in part, reversed in part and remanded.

Law Office of Joshua D. Gruenberg, Joshua D. Gruenberg, Susan M. Swan; Boudreau Williams and Jon R. Williams for Plaintiff and Appellant.

Daley & Heft, Lee H. Roistacher and Robert W. Brockman, Jr., for Defendant and Respondent.

Cecilia Diego sued her former employer Pilgrim United Church of Christ (Pilgrim United) for wrongful termination in violation of public policy. Diego alleged she was terminated from her employment as assistant director of Pilgrim United's preschool as a

result of the director's mistaken belief that she had lodged a complaint with the Community Care Licensing Division of the California Department of Social Services[1] (Licensing) which resulted in an unannounced inspection of the preschool.

The trial court granted summary judgment in favor of Pilgrim United on the basis that, because Diego in fact had not made a complaint to Licensing (or otherwise engaged in activity associated with protected disclosure of alleged wrongdoing), her termination of employment did not violate public policy as a matter of law.[2] We disagree and reverse that part of the judgment directed to Diego's claim for wrongful termination in violation of public policy and remand with instructions that the court enter an order denying Pilgrim United's motion.

At the onset, we stress the limited issue that is presented and decided in part II.A., *post*: Does California public policy preclude Pilgrim United from retaliating against Diego based on Pilgrim United's mistaken belief that Diego had disclosed information to Licensing regarding Pilgrim United's alleged violation of, or noncompliance with, state regulations applicable to preschools?

---

[1] In the record and appellate briefing, the agency is referred to by various names. Based on the allegations in the complaint, the evidence submitted to the trial court, and the briefs on appeal, we assume the parties intend to identify the Community Care Licensing Division of the California Department of Social Services. (See <http://ccld.ca.gov/Default.htm> [as of Nov. 19, 2014].)

[2] In her complaint, Diego also alleged a cause of action for intentional infliction of emotional distress. Because she does not appeal from that portion of the judgment in favor of Pilgrim United on this claim, our references to Pilgrim United's motion for summary judgment are only to that portion of the motion directed to Diego's claim for wrongful termination.

I.

FACTUAL AND PROCEDURAL BACKGROUND[3]

Pilgrim United hired Diego as an at-will employee in or around 2002. Ultimately she became a "mentor teacher," and her supervisor, Anne Lewis, who was the director of the preschool, considered her the assistant director.

At some point shortly before August 19, 2011,[4] another of Pilgrim United's employees, Cynthia Saldana, told Diego that she (Saldana) had called Licensing anonymously to complain about (1) a foul odor in one of the classrooms, and (2) inadequate sand beneath the playground equipment.[5] On August 19, representatives from Licensing made an unannounced inspection at the preschool in response to the anonymous report. Licensing neither found a violation nor issued a citation.

According to Diego, during a telephone conversation on August 23, Lewis discussed the anonymous report to and visit from Licensing. Among other comments,

---

[3] As required in an appeal from a summary judgment, we "view the evidence in the light most favorable to" Diego, we "liberally construe" Diego's evidence, and we "strictly scrutinize" the evidence of Pilgrim United "in order to resolve any evidentiary doubts or ambiguities in [Diego's] favor." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*).)

[4] All subsequent dates are to the year 2011 unless otherwise indicated.

[5] According to Diego, the state regulations associated with such complaints include California Code of Regulations, title 22, section 101239, subdivision (f) ("Solid waste shall be stored, located and disposed of in a manner that will not transmit . . . odors . . . .") and section 101238.2, subdivision (e) ("the areas around and under high climbing equipment, swings, slides and other similar equipment shall be cushioned with material that absorbs falls"). These regulations are statutorily authorized by the California Child Day Care Act. (Health & Saf. Code, § 1596.81.)

3

Lewis asked Diego why she was " 'doing this' " and whether Diego wanted Lewis " 'gone,' " explaining that people had been telling her " 'things.' " Lewis stated that " 'at this point, the State is going to take over [the preschool].' " In response to Diego's inquiry whether Lewis was referring to Licensing, Lewis explained that " 'they want to know why [L]icensing has received more violations in the last 24 months more than in the history of Pilgrim [United's preschool,]' or words to that effect." Based on this conversation, Diego understood that Lewis was angry *with her* for having anonymously communicated the report to Licensing that prompted the unannounced inspection four days earlier.

Later that same day, Lewis again telephoned Diego, asking her to attend a meeting the next day (August 24) with her and the pastor of Pilgrim United, Madison Shockley. Because Diego had plans to be out of town on August 24, she asked that the meeting instead take place on Friday, August 26; on August 25, she called and left a voicemail message rescheduling the meeting to the following Monday, August 29, because August 26 was a vacation day.

The meeting never took place. On August 26, Lewis called and left a message for Diego; when Diego returned the call, Lewis told her she was fired. Diego testified that she believed Pilgrim United terminated her employment because of the anonymous report to Licensing.

Pilgrim United disputes much of the foregoing evidence, in particular the substance of the August 23 telephone conversation. Pilgrim United contends it

4

discharged Diego due to insubordination, never having thought that Diego made the anonymous report to Licensing.

In October, Diego filed the underlying complaint against Pilgrim United. As relevant to this appeal, Diego alleged that Pilgrim United's termination of her employment was retaliatory in violation of California public policy. Pilgrim United answered the complaint; the parties conducted discovery; and Pilgrim United filed a motion for summary judgment or, in the alternative, for summary adjudication.

In its motion, Pilgrim United argued that it was entitled to judgment as a matter of law on the basis that Diego could not establish an essential element of her claim for wrongful termination in violation of public policy, namely, that the termination of her employment violated a policy articulated by constitutional or statutory authority. More specifically, Pilgrim United posited that no constitutional or statutory authority extended whistleblower protections to employees merely *believed* to have engaged in protected activity.

In opposition to the motion, Diego argued that Pilgrim United's termination of her employment violated the public policy that protected an employee for "perceived whistleblower" activity — in this case, reporting violations of regulations necessary to carry out the California Child Day Care Act (see fn. 5, *ante*).

In reply to the opposition, Pilgrim United argued that Diego's discharge could not have violated such a public policy, because Diego did not engage in any conduct in furtherance of protecting children's safety or education and there is no statutory protection for mistakenly perceived whistleblowers.

5

The trial court granted Pilgrim United's motion, ruling in relevant part that Diego did not meet her burden of establishing a significantly important public policy that was implicated by constitutional or statutory authority. The court based its decision on Diego's failure to "cite[] to any case holding that an employer's *mistaken* belief that the employee reported a violation can support a claim for wrongful termination in violation of public policy." (Italics added.)

The court entered an amended judgment from which Diego timely appealed. (Code Civ. Proc., § 904.1, subd. (a)(1); Cal. Rules of Court, rule 8.104(a)(1).)

II.

DISCUSSION

A.      *Wrongful Termination in Violation of Public Policy*

Diego contends she adequately presented a cause of action for wrongful termination in violation of public policy against Pilgrim United. We agree.

In California the Legislature has determined that employment without a specified term "may be terminated at the will of either party." (Lab. Code, § 2922.) However, "an employer's traditional broad authority to discharge an at-will employee 'may be limited . . . by considerations of public policy.' " (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 (*Tameny*); see *Jennings v. Marralle* (1994) 8 Cal.4th 121, 129 (*Jennings*) [the tort of wrongful termination in violation of public policy is an exception to Lab. Code, § 2922]; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71 (*Green*) ["[A]t-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy."].)

6

As applicable here, Diego's claim for wrongful discharge in violation of public policy requires proof that (1) she was employed by Pilgrim United, (2) Pilgrim United discharged her, (3) a violation of public policy substantially motivated the discharge, and (4) the discharge caused harm to her.  (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; Jud. Council of Cal. Civ. Jury Instns. (2014) CACI No. 2430.) The legal issue in this appeal involves the third element, namely, whether California has a public policy that was violated when Pilgrim United terminated Diego's employment.

To this end, Diego "must show that the important public interests [she] seek[s] to protect are 'tethered to fundamental policies' " in the statute(s) on which she relies. (*Green*, *supra*, 19 Cal.4th at p. 71.)  More specifically, to be actionable, the discharge must violate a policy that is "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) 'substantial' and 'fundamental.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 901-902 (*Stevenson*); see *id.* at pp. 890, 894; *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 929 (*Carter*).)

"Whether the policy upon which a wrongful termination claim is based is sufficiently fundamental, well-established and tethered to a statutory or constitutional provision to support liability is a legal question that we review de novo."[6] (*Carter*,

---

[6] *Carter* was an appeal from a judgment following a jury trial.  (*Carter*, *supra*, 148 Cal.App.4th at pp. 927-928.)  Here, where the issue arises in an appeal following a summary judgment, the standard of review is the same.  (*Wiener*, *supra*, 32 Cal.4th at

*supra*, 148 Cal.App.4th at p. 929.)  Because "the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state," we proceed " 'with great care and due deference to the judgment of the legislative branch' in order to avoid judicial policymaking."  (*Green*, *supra*, 19 Cal.4th at pp. 71, 76; *Carter*, at p. 931, fn. 9; see *Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1104 (*Silo*).)

The statutory provisions on which Diego relies include former Labor Code section 1102.5, subdivision (b) (former section 1102.5(b))[7] and Labor Code section 6310 (section 6310).[8]  Since we will decide that former section 1102.5(b) establishes the Legislature's declaration of a public policy sufficient to allow Diego's claim to proceed, we need not opine on the policy or policies delineated in section 6310.

---

p. 1142 [we independently review the trial court's ruling in an appeal from the grant of summary judgment].)

[7]     The version of the statute that was applicable at the time of Diego's discharge, former section 1102.5(b), provided:  "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."  (Stats. 2003, ch. 484, § 2; see *Carter*, *supra*, 148 Cal.App.4th at p. 933.)  Former section 1102.5(b) was amended effective January 1, 2014.  (Stats. 2013, ch. 781, § 4.1.)

[8]     Section 6310 was originally enacted as part of the California Occupational Safety and Health Act of 1973 (Stats. 1973, ch. 993, § 59); and the retaliation proscribed by section 6310 is limited to discharge after an employee's complaint to "the division [the California Division of Occupational Safety and Health], other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative."  (§ 6310, subds. (a)(1), (b).)

Initially we reject Pilgrim United's argument that Diego is not "a protected employee" for purposes of former section 1102.5(b). Citing *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256 (*Turner*), Pilgrim United contends that "a protected employee" *must* fall into one of four specific categories — as applicable here, one who "reports an alleged violation of a statute of public importance"[9] — yet Diego did not report a violation. However, all Diego needs to show is that her "public policy source is 'tethered to' . . . a specific . . . statutory provision." (*Green*, *supra*, 19 Cal.4th at p. 76; see *Turner*, at p. 1256 ["Tort claims for wrongful discharge *typically* arise when an employer retaliates against an employee for '. . . reporting an alleged violation of a statute of public importance.' " (Italics added.)]; *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090-1091 (*Gantt*), overruled on other grounds in *Green, supra,* 19 Cal.4th at p. 80, fn. 6 ["[T]he cases in which violations of public policy are found *generally* fall into four categories: . . . (4) reporting an alleged violation of a statute of public importance." (Italics added.)].)

     1.    *Public policy is delineated in former section 1102.5(b)*

By tethering public policy to a specific statutory provision, we "avoid judicial interference with the legislative domain." (*Stevenson*, *supra*, 16 Cal.4th at p. 889; *Carter*, *supra*, 148 Cal.App.4th at p. 929.)

---

[9]    To the extent Pilgrim United's argument includes a distinction between reporting violations of state statutes and state regulations, we reject it. Former section 1102.5(b) expressly protected the disclosure to a government agency of "a violation or noncompliance *with a state . . . regulation*." (Italics added.)

Although " ' "[t]he term 'public policy' is inherently not subject to precise definition," ' " our Supreme Court has given us guidance in the context of a wrongful termination of employment in violation of public policy:  Public policy is " ' " 'that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.' " ' "  (*Green*, *supra*, 19 Cal.4th at p. 76, quoting from *Safeway Stores v. Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 575 (*Safeway Stores*).)[10]

Former section 1102.5(b) precludes an employer from retaliating against an employee for disclosing a violation of state regulations to a governmental agency.  The 2003 amendments to former Labor Code section 1102.5, which included the enactment of former section 1102.5(b) under consideration here, contain a statement of legislative purpose:  "The Legislature finds and declares that it is the public policy of the State of California to encourage employees to notify an appropriate government or law enforcement agency when they have reason to believe their employer is violating laws enacted for the protection of corporate shareholders, investors, employees, and the general public."  (Stats. 2003, ch. 484, § 1; see Historical and Statutory Notes, 44A West's Ann. Lab. Code (2011 ed.) foll. former Lab. Code, § 1102.5, p. 218.) Consistently, the Supreme Court has stated that the purpose of former section 1102.5(b)

---

10    In a pre-*Tameny* opinion, the Court of Appeal relied on this same language from *Safeway Stores* in concluding an employer's right to discharge an employee could be limited by considerations of "public policy."  (*Petermann v. Internat. Brotherhood of Teamsters, etc.* (1959) 174 Cal.App.2d 184, 188.)

"is to 'encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287, quoting from *Green*, *supra*, 19 Cal.4th at p. 77; *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1546.)

Given that the public policy behind former section 1102.5(b) is to encourage employees to report suspected violations of law, as applicable here we must determine whether that policy applies to a terminated employee who was merely perceived by the employer to be a whistleblower. We believe it does.

Although we are not aware of authority under former section 1102.5(b), we find guidance in *Lujan v. Minagar* (2004) 124 Cal.App.4th 1040 (*Lujan*), which recognized a decade ago that terminating a perceived whistleblower will discourage employees from reporting. In *Lujan*, the court ruled that section 6310 protects employees against *preemptive* retaliation by an employer that believes an employee *might* file a workplace safety complaint. (*Lujan*, at p. 1046; see fn. 8, *ante*.) Similar to the public policy delineated in former section 1102.5(b), the legislative intent associated with section 6310's proscription against retaliation includes "encourag[ing] such [workplace safety] complaints." (*Lujan*, at p. 1045.) The *Lujan* court reasoned that "firing workers who are suspected of planning to file workplace safety complaints *can effectively discourage the filing of those complaints*." (*Ibid.*, italics added.) The result should be no different for employees suspected of actually filing a complaint. Applying *Lujan*'s reasoning here, therefore, if an employee "can effectively [be] discourage[d]" (*ibid.*) from reporting a violation by the employer's mere belief a report might be made or has been

11

made, then the public policy delineated in former section 1102.5(b) will be violated. Stated differently, when the termination of employment is based on the employer's mistaken belief that the employee might disclose or has disclosed a violation of state regulations to a governmental agency, the result " ' " 'has a tendency to be injurious to the public or against the public good.' " ' " (*Green*, *supra*, 19 Cal.4th at p. 76).[11]

Accordingly, Pilgrim United's alleged actions in discharging Diego are sufficiently tethered to the policy delineated in former section 1102.5(b).[12]

Pilgrim United argues that *Lujan* is inapplicable because it ignores rules of statutory construction in analyzing the public policy associated with section 6310. Indeed, rather than focusing on public policy, Pilgrim United misdirects much of its presentation to statutory construction. More specifically, Pilgrim United relies on the

---

[11]    Any other interpretation would lead to an inequitable result. If we assume that based solely on an anonymous report to Licensing, Pilgrim United had terminated both Diego and Saldana, when in fact Saldana had reported the suspected violations, then public policy would allow Saldana (who actually made the report) to present a claim for wrongful termination, but not Diego (who did nothing). Under either situation, public policy precludes Pilgrim United from having taken such retaliatory action.

[12]    In contrast, in *Carter*, a teacher claimed he was not hired following his probationary period because, while employed as a teacher at another school, he informed the athletic director there that the football coach had recommended a nutritional supplement to a student. (148 Cal.App.4th at p. 925.) The teacher relied on former section 1102.5(b) — the same statute at issue here — in arguing that public policy precluded the retaliatory employment decision. (*Carter*, at p. 933.) We rejected the teacher's argument, because the teacher's report to the athletic director was not "[c]arefully [t]ethered" to former section 1102.5(b)'s requirements (1) that the information disclosed by the employee-teacher disclose a violation of a statute or a violation or noncompliance with a regulation, (2) that the employee-teacher was not motivated by a belief that the coach had not complied with the law, or (3) that even if the employee-teacher subjectively had such a belief, it was unreasonable. (*Carter*, at p. 933.)

12

plain and unambiguous language of former section 1102.5(b), cautioning against judicially extending the *statutory* protections of former section 1102.5(b). However, Diego is not asserting a *statutory claim* under former section 1102.5(b). We have looked to the statute to determine the public policy of the state in our effort to resolve whether, as a matter of law, Diego's claim is carefully tethered to *the fundamental policies delineated in* former section 1102.5(b) (*Green*, *supra*, 19 Cal.4th at p. 71; *Gantt*, *supra*, 1 Cal.4th at p. 1095) — *not* to determine whether she has alleged *the elements of a statutory claim under* former section 1102.5(b).[13]

Pilgrim United argues that because former section 1102.5(b) does not mention, let alone protect, "perceived whistleblowers" — and, thus, does not specifically prohibit the conduct alleged here — former section 1102.5(b) does not sufficiently delineate an applicable public policy. However, "one should not assume that the employer's *precise act . . .* must be specifically prohibited for the public policy exception to apply." (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480 (*Sequoia Ins.*); see

---

13    For this reason, the out-of-state *statutory* authorities on which Pilgrim United relies are irrelevant to this appeal, and we accordingly deny Pilgrim United's motion to take judicial notice of them. (Evid. Code, § 452, subd. (a); *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 (*Shamrock Foods Co.*) ["any matter to be judicially noticed must be relevant to a material issue"].)

Pilgrim United also asks us to take judicial notice of the legislative history associated with Senate Bill No. 496, which included what ultimately became the *current* version of Labor Code section 1102.5 (Stats. 2013, ch. 781, § 4.1). However, the statute ultimately became effective *after*, and thus does not apply to, the events underlying Diego's claim; Pilgrim United presents no argument related to either this statute or these documents. Accordingly, these documents are also irrelevant, and we deny the motion as to them on that basis. (Evid. Code, § 452, subd. (a); *Shamrock Foods Co.*, *supra*, 24 Cal.4th at p. 422, fn. 2.)

*Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 80-81 ["provision does not have to specifically prohibit the employer's precise act"].) All that is required is that the statutory provision "sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law." (*Sequoia Ins.*, *supra*, 13 Cal.App.4th at p. 1480.)[14]

In a related contention, Pilgrim United quotes from *Stevenson*, *supra*, 16 Cal.4th at page 904, and argues that a common law claim for wrongful termination in violation of public policy " 'is subject to statutory limitations affecting the nature and scope of the statutory prohibition.' " However, the fact that former section 1102.5(b) does not expressly protect perceived whistleblowers is not the type of statutory limitation the *Stevenson* court considered. There, our Supreme Court was referring to and *distinguishing* its earlier opinion in *Jennings*, *supra*, 8 Cal.4th 121. (*Stevenson*, at p. 904.) In *Jennings*, the Court declined to allow a common law tort action for age discrimination against an employer with fewer than five employees, because the public policy against such discrimination delineated in the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) included *an express statutory limitation* exempting employers having fewer than five employees (*id*., § 12926, subd. (d)).[15] (*Jennings*, at p. 132 ["[T]he Legislature did not intend to make the right to be free of age

---

14      We discuss notice to Pilgrim United in parts I.A.3. & 4., *post*.

15      In distinguishing *Jennings*, *Stevenson* held that an older worker *may* assert a common law tort claim for wrongful discharge in violation of public policy against an employer with five or more employees. (*Stevenson*, *supra*, 16 Cal.4th 880.)

14

discrimination by a small employer a 'fundamental' public policy and to thereby subject employers who are not within the FEHA's statutory prohibitions and remedies to *Tameny*-based common law civil liability for age discrimination."].)  Here, there is no such statutory limitation; former section 1102.5(b) is silent as to perceived whistleblowers, and we will not infer the limitation Pilgrim United suggests.

    2.    *This policy is for the benefit of the public*

The policy allegedly violated by the termination of employment must be one that "inures to the benefit of the public at large rather than to a particular employer or employee."  (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 669 (*Foley*); see *Stevenson*, *supra*, 16 Cal.4th at pp. 894, 901-902.)  That is because the tort remedy exists "*not only* to compensate the individual plaintiff for the loss of employment but as an indirect means of vindicating the underlying fundamental *public policy itself*."  (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1181.)

Policies are not "public" (and thus do not give rise to a common law tort claim) when they are derived from statutes that "simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns."  (*Foley*, *supra*, 47 Cal.3d at p. 669.)  In *Foley*, for example, because the employee's report to the employer that the FBI was investigating a coworker for embezzlement only served the private interest of the employer, the employee's claim for tortuous discharge in violation of public policy was not actionable.  (*Id.* at pp. 669-671.)

15

" '[T]ermination of an employee most clearly violates public policy when it contravenes the provision of a statute forbidding termination for a specified reason.' " (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1372.)  Here, of course, former section 1102.5(b) forbids termination of employment where the employee discloses information to a government agency when she has reasonable cause to believe the information evidences a violation or noncompliance with a state regulation. Consistent with "the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation" (*Green*, *supra*, 19 Cal.4th at p. 77; see pt. II.A.1., *ante*), this policy benefits society at large, not any specific employer or employee.

3.     *The policy was well established at the time of the discharge*

The public policy violated by an alleged wrongful discharge must be "one about which reasonable persons can have little disagreement, and which was 'firmly established' at the time of discharge."  (*Foley*, *supra*, 47 Cal.3d at p. 668; see *Stevenson*, *supra*, 16 Cal.4th at p. 889 [policy must be " 'well established' at the time of the discharge"].)

Here, the conduct prohibited by the policy is an employer's retaliation based on an employee's report of violations of state regulations in the workplace.  Pilgrim United does not directly contend either that such a policy was not firmly established or that it did not have notice of the policy.  Nor could it, given that the original enactment of Labor Code section 1102.5 in 1984 "reflects the *broad public policy interest* in encouraging

16

workplace whistle-blowers to report unlawful acts without fearing retaliation." [16] (*Green*, *supra*, 19 Cal.4th at p. 77, italics added; see *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1123 (*Collier*) [same].) Even in 1984, this was not considered a new concept: "This public policy is the modern day equivalent of the long-established duty of the citizenry to bring to public attention the doings of a lawbreaker." (*Collier*, at p. 1123.)

Instead, as mentioned above, Pilgrim United's focus is misdirected to the *language* of former section 1102.5(b), rather than to the *policy* delineated in the statute. We reject any suggestion that because former section 1102.5(b) neither mentions nor prohibits termination of employment based on a perceived whistleblower, Pilgrim United was unaware it could not retaliate against Diego. Pilgrim United's *precise act* need not be specifically prohibited for the public policy to apply; all that is required is that former section 1102.5(b) "must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law." (*Sequoia Ins.*, *supra*, 13 Cal.App.4th at p. 1480; *Turner*, *supra*, 7 Cal.4th at p. 1256, fn. 9.)

---

[16] The original language in the predecessor to former section 1102.5(b), enacted in 1984, is virtually identical to former section 1102.5(b), enacted in 2003, and provided: "No employer shall retaliate against an employee for disclosing information to a government . . . agency, where the employee has reasonable cause to believe that the information discloses a . . . violation or noncompliance with a state or federal regulation." (Stats. 1984, ch. 1083, § 1.)

17

Since the statute's original enactment in 1984, employers like Pilgrim United have been on notice that California public policy is to encourage workplace whistleblowers to report unlawful acts without fearing retaliation. (*Green*, *supra*, 19 Cal.4th at p. 77; *Collier*, *supra*, 228 Cal.App.3d at p. 1123.) This policy was reaffirmed in the 2003 amendment that resulted in the version of the statute applicable here, namely, former section 1102.5(b). (Stats. 2003, ch. 484, § 1 ["The Legislature finds and declares that it is the public policy of the State of California to encourage employees to notify an appropriate government or law enforcement agency when they have reason to believe their employer is violating laws enacted for the protection of corporate shareholders, investors, employees, and the general public."].) By the time of Diego's discharge in 2011, reasonable people could have had little disagreement about this firmly established policy.

4.  *The public policy is substantial and fundamental*

Finally, the policy expressed in the statute and allegedly violated by the termination of employment must be "substantial and fundamental." (*Stevenson*, *supra*, 16 Cal.4th at pp. 894-898.) "Fundamental" and "substantial" are treated as a single concept (see *id*. at p. 890, fn. 4), and at times it is considered together with the previously discussed concept of whether the policy is "well established" (see *Gantt*, *supra*, 1 Cal.4th at p. 1090; *Sullivan v. Delta Air Lines, Inc.* (1997) 58 Cal.App.4th 938, 943 [a "corollary of the substantial and fundamental requirement" is that the public policy be well established]).

18

Under either requirement, the purpose is "to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge." (*Stevenson*, *supra*, 16 Cal.4th at p. 889.)  Understandably, "an employer cannot be held liable for violating a public policy that was not manifest at the time it committed the alleged tortious action." (*Silo*, *supra*, 27 Cal.4th at p. 1110.)

As established in part II.A.3., *ante*, for at least 27 years prior to the termination of Diego's employment, the public policy of the State of California delineated in former section 1102.5(b) — beginning in 1984 with the predecessor to Labor Code section 1102.5 and continuing through the 2003 amendment that resulted in the statute at issue — has consistently been articulated to encourage workplace whistleblowers to report unlawful acts without fearing retaliation.  This is in contrast, for example, to *Carter*, *supra*, 148 Cal.App.4th 922, where the statute on which the plaintiff relied to establish the public policy "d[id] not 'sufficiently describe [any] prohibited conduct to enable an employer to know the *fundamental* public policies that are expressed in that law' as is required for wrongful termination liability."[17] (*Carter*, at p. 931, italics added; see *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 931-933 [Compassionate Use Act of 1996, which provided a defense in state criminal prosecutions for the use of marijuana in certain circumstances, did not express

---

17    In *Carter*, *supra*, the teacher-employee relied on a section of the Education Code that restricted school employees from assisting in the taking of most medications under most circumstances and related regulations that allowed, but did not require, school medical personnel to assist in administering medication following submission of certain required written authorization.  (148 Cal.App.4th at pp. 930, 932.)

19

sufficiently fundamental public policy related to employment law so as to "put defendant on notice that employers would thereafter be required under [FEHA] to accommodate the use of marijuana"].)  Here, former section 1102.5(b) expressly described the conduct it prohibited (retaliation for whistleblowing), and the public policy delineated in the statute had been established well before Diego's termination.

5.      *Conclusion*

In deciding the public policy delineated in former section 1102.5(b), namely, to encourage employees to notify an appropriate government agency when they have reason to believe their employer is violating regulations adopted pursuant to laws enacted for the protection of corporate shareholders, investors, employees, and the general public (Stats. 2003, ch. 484, § 1; *Green*, *supra*, 19 Cal.4th at p. 77) — we do so " 'with great care and due deference to the judgment of the legislative branch.' "  (*Green*, at p. 76.) This policy applies to preclude retaliation by an employer not only against employees who actually notify the agency of the suspected violations but also against employees whom the employer suspects of such notifications.  (See *Lujan*, *supra*, 124 Cal.App.4th at p. 1045 [terminating perceived whistleblowers "can effectively discourage the filing of those complaints"].)  Otherwise, the policy to encourage the reporting of alleged violations will be frustrated.[18]

_____

[18]     Both parties cite numerous federal and non-California state court decisions from around the country that discuss whether an employer may retaliate against a "perceived whistleblower."  None deals either with California public policy generally or former section 1102.5(b) specifically.  Pilgrim United also cites federal district court decisions in which the courts declined to apply former section 1102.5(b) in situations that did not

"The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception [to to the at-will employment doctrine] presents no impediment to employers that operate within the bounds of law." (*Gantt*, *supra*, 1 Cal.4th at p. 1095; *Stevenson*, *supra*, 16 Cal.4th at p. 889.)

Thus, we conclude that the policy delineated in former section 1102.5(b) precluded Pilgrim United from discharging Diego on its mistaken belief that she had reported to Licensing suspected violations of regulations statutorily authorized by the California Child Day Care Act.[19]

B.      *Disputed Issues of Fact Preclude Summary Judgment*

Because the trial court ruled as a matter of law that Diego had not established a sufficient policy on which to base her claim for wrongful discharge in violation of public policy, the court did not rule on Pilgrim United's alternative argument that Pilgrim United discharged Diego for insubordination and she could present no evidence of any alleged protected activity. The parties have briefed this issue in the appeal. Accordingly, we reach the alternative argument, since summary judgment has been granted in favor of

---

involve an employer's mistaken belief that an employee had reported a violation. Given Diego's specific claim and the well-defined standards we are to apply in determining California public policy, we have not based our decision on these authorities.

[19]      We express no opinion on the validity of Diego's claim or Pilgrim United's defenses to the claim — only that, as a matter of law, the tort of wrongful discharge in violation of public policy is broad enough to allow recovery for such a claim upon sufficient proof to a trier of fact.

Pilgrim United, and "we are not bound by the trial court's stated reasons for its ruling on the [summary judgment] motion; we review only the trial court's ruling and not its rationale." (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402.)

In this appeal from an order granting Pilgrim United's motion for summary judgment, "we independently examine the record in order to determine whether triable issues of fact exist to reinstate the action." (*Wiener*, *supra*, 32 Cal.4th at p. 1142.) In so doing, we " 'employ[] the same process as the trial court in determining whether, as a matter of law, summary judgment was appropriate.' " (*Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054.) We will liberally construe the evidence in support of Diego's opposition to the motion and then assess whether the evidence, if credited, would permit the trier of fact to find in her favor under applicable legal standards. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843, 850 (*Aguilar*).)

"When a plaintiff alleges retaliatory employment termination . . . as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 to determine whether there are triable issues of fact for resolution by a jury. [Citation.] In the first stage, the 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.] If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the

22

adverse employment action. [Citation.] If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation " ' "drops out of the picture," ' " ' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual." (*Loggins v. Kaiser Permanente Intern.* (2007) 151 Cal.App.4th 1102, 1108-1109 (*Loggins*).)

In the trial court and again on appeal, Pilgrim United concedes that, in the event public policy is implicated by Diego's version of the facts, Diego can meet her initial burden, arguing only that "all Pilgrim [United] had to do was proffer a legitimate reason for Diego's termination." To then meet her rebuttal burden (*Loggins*, *supra*, 151 Cal.App.4th at p. 1109), Diego would be required to provide substantial evidence that Pilgrim United's stated nondiscriminatory reason for the termination of employment is *either* " ' " 'untrue or pretextual,' " ' " *or* " ' " 'the employer acted with a discriminatory animus,' " ' " *or* " ' " 'a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' " ' " (*Batarse v. Service Employees Intern. Union Local 1000* (2012) 209 Cal.App.4th 820, 834 (*Batarse*).) To do this, Diego must establish *either* that Pilgrim United's proffered explanation " ' "is unworthy of credence" ' " *or* that " ' "a discriminatory reason more likely motivated [Pilgrim United]." ' " (*Ibid.*)

The "legitimate reason" proffered by Pilgrim United for terminating Diego is that it discharged her based on "insubordination" and "an insubordinate and hostile attitude," as evidenced by her refusal to follow instructions to attend meetings. The only specific

23

example was Diego's August 25 refusal to attend one meeting on August 26; yet she was on vacation at that time and stated she would meet the next business day.[20] In addition, Shockley testified generically that Diego had refused to attend "several meetings," but he did not have personal knowledge, since those meetings were not with him, and he did not mention the dates, times or places of the meetings.

In response, the evidence of retaliation offered by Diego, discussed below, included: (1) her many years of employment, including promotions, and a December 2010 year-end favorable review; (2) the timing of the firing of a 10-year employee only seven days after Licensing's unannounced inspection; and (3) the substance of the August 26 telephone conversation during which Lewis fired her.

As to the first evidentiary argument, Diego had been employed by Pilgrim United almost 10 years. Over the years, she rose from teacher to "mentor teacher," and the director of the preschool (Lewis, Diego's supervisor) considered her the assistant director. In December 2010, Diego received a letter from Pilgrim United, written by Lewis, in which some of Diego's skills were praised, yet certain of her unidentified "misdeeds" were described as a "disappointment." Later in December, when Diego met with Shockley and Lewis, Shockley asked Lewis to explain what she meant by the written review, but Lewis could provide no examples of behavior to support the written criticism.

---

[20]    That meeting never took place, of course, because Pilgrim United terminated Diego's employment the afternoon of August 26.

24

Lewis eventually apologized to Diego and told her she (Lewis) "would delete the letter from the computer 'as if it never happened.' "

As to the second evidentiary argument, representatives from Licensing made the unannounced inspection at the preschool on August 19. Just one week later, on August 26, Pilgrim United fired Diego, an almost 10-year employee.

As to the final evidentiary argument, during an August 23 telephone conversation between Lewis and Diego, Lewis discussed both the anonymous report to and visit from Licensing. Lewis asked Diego why she was " 'doing this' " and whether she wanted Lewis " 'gone.' " Lewis explained that people had been telling her " 'things,' " stating that "at this point, the State is going to take over [the preschool]." When Diego asked whether Lewis was referring to the Licensing complaint, she responded that " 'they want to know why [L]icensing has received more violations in the last 24 months more than in the history of Pilgrim [United's preschool,]' or words to that effect."

Diego's evidence, individually and collectively, supports Diego's theory that her discharge was motivated by discrimination rather than insubordination. Although "temporal proximity alone is not sufficient to raise a triable issue as to pretext," "temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353, 354.) Here, Pilgrim United discharged a 10-year employee within a week of Licensing's unannounced inspection and within three days of a telephone conversation in which Lewis expressed displeasure with Diego, specifically mentioning Licensing and regulatory violations. Moreover, Pilgrim United had promoted Diego over the 10 years of her employment, where her only

25

arguably negative performance review was unsupported by facts and ultimately deleted. Considering all of the evidence — and viewing the evidence in the light most favorable to Diego, including all inferences therefrom, as we must (*Aguilar*, *supra*, 25 Cal.4th at p. 843) — Diego has met her summary judgment burden of establishing triable issues of fact as to whether Pilgrim United was more likely motivated by a discriminatory reason (retaliation) than by its proffered explanation (insubordination).[21]

## DISPOSITION

The judgment is reversed as to the first cause of action for alleged discrimination in violation of public policy and is otherwise affirmed. The matter is remanded to the trial court with instructions to enter an order denying Pilgrim United's motion for summary judgment/adjudication directed to the first cause of action. Diego is to recover her costs on appeal from Pilgrim United. (Cal. Rules of Court, rule 8.278(a).)

IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.

---

[21]     We express no opinion as to the existence of material issues of fact whether Pilgrim United's proffered explanation is, in the language of *Batarse*, *supra*, 209 Cal.App.4th at page 834, " ' "unworthy of credence." ' "